## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| NAUQUITA L. HAMBRIGHT, | ) | **Bankruptcy Case No. 20-70608-JHH13** |
| | ) | |
| Debtor. | ) | |

---

| | | |
|---|---|---|
| TITLEMAX OF ALABAMA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary Proceeding No. 20-70016-JHH** |
| | ) | |
| NAUQUITA L. HAMBRIGHT and | ) | |
| C. DAVID COTTINGHAM, CHAPTER | ) | |
| 13 STANDING TRUSTEE, | ) | |
| | ) | |
| Defendants. | ) | |

### AMENDED[1] MEMORANDUM OPINION AND ORDER

## I.      Introduction and Overview[2]

This is a proceeding to determine and declare the present interests of a secured party, TitleMax of Alabama, Inc. ("TitleMax"), a chapter 13 debtor, Nauquita L. Hambright ("Hambright"), and Hambright's bankruptcy estate (the "Estate"), in and to a 2013 Dodge Challenger (the "Vehicle"). Cross motions for summary judgment are pending before the court, and the material facts are stipulated or undisputed. Both federal and state law are relevant to

---

[1] To the extent that this court has jurisdiction, this Amended Memorandum Opinion and Order is entered to correct certain mistakes in the court's original Memorandum Opinion and Order that are clerical in nature or arise from oversight or omission on the part of the undersigned. *See* Fed. R. Civ. P. 60(a); Fed. R. Bankr. P. 9024.

[2] Citations are omitted from the introduction and overview for the reader's ease but are included elsewhere. In this opinion, "Alabama UCC" refers to title 7 of the Code of Alabama; "Alabama Article 9A" refers to article 9A of title 7 of the Code of Alabama; "Alabama Certificate of Title Act" refers to chapter 8 of title 32 of the Code of Alabama; "Alabama Pawnshop Act" refers to chapter 19A of title 5 of the Code of Alabama; "Bankruptcy Act" refers generally to the Bankruptcy Acts of 1898 and 1938 or either of them; "Bankruptcy Code" refers to title 11 of the United States Code; "Old Alabama Article 9" refers to article 9 of title 7 of the Code of Alabama (repealed eff. Jan. 1, 2002); and "UCC" refers generally to the Uniform Commercial Code.

defining the parties' and the Estate's petition date and present interests in the Vehicle. However, a single state law question predominates—under Alabama law, were the Estate's right(s) and interest(s) in the Vehicle forfeited to TitleMax automatically, and without the necessity of any affirmative enforcement action by TitleMax, after the bankruptcy petition date?

The answer to this question turns on whether the Vehicle, which is in the actual possession of Hambright, is subject to classification as a pledged good under the Alabama Pawnshop Act by virtue of Hambright's pre-bankruptcy pledge of the Vehicle's certificate of title to TitleMax. If so, Hambright's petition date right(s) and interest(s) in the Vehicle (which passed to the Estate on commencement of Hambright's bankruptcy case), and not merely the Estate's petition date right(s) and interest(s) in the Vehicle's certificate of title (if any), may be subject to the Alabama Pawnshop Act's automatic forfeiture provision. This statute provides for the automatic transfer of all right, title, and interest of a pawnor in and to pledged good(s) to the pawnbroker if the pawnor fails to regain possession of the pledged good(s) by paying the secured obligation within 30 days after the obligation's maturity (i.e., a pawnor's forfeiture of legal and equitable title to pledged good(s) is the consequence of the pawnor's failure to timely exercise the pawnor's temporal right to redeem the pledged good(s) from the pawnbroker).

Importantly, a vehicle and a vehicle's certificate of title are separate property under Alabama law, and neither possession of a certificate of title, nor the information recorded thereon, is determinative of where title to the covered vehicle lies. In other words, absolute title to a vehicle, in the intangible sense, is not bound up in the vehicle's certificate of title. A certificate of title's legal significance lies in the information recorded thereon and presumptively evidenced thereby.

There is no allegation that Hambright validly assigned (i.e., endorsed) the Vehicle's certificate of title to TitleMax, meaning its delivery to TitleMax does not evidence an absolute title

transfer. The operative certificate merely records that TitleMax holds a first-priority lien on the Vehicle. A secured party's possession of a certificate of title that records the secured party as the first lienholder is necessary to render the secured party's first-priority security interest in the subject vehicle invulnerable to interests subsequently created by the record owner (i.e., perfected); thus, such a certificate is not a chose in action. However, it does not follow that forfeiture of an unendorsed certificate of title to the named lienholder—which certificate is, under the Alabama Certificate of Title Act, the lienholder's to possess until the lienholder's interest in the vehicle is satisfied or deemed satisfied or otherwise discharged—effects an absolute transfer of title to the vehicle to the named lienholder if the vehicle is not also forfeited. A secured party would not obtain a security interest in an unendorsed certificate of title, but not the vehicle covered thereby, expecting foreclosure of the record to manifest in its ownership of the vehicle, because a certificate of title is not a document of title under the Alabama UCC (nor is an unendorsed certificate of title subject to classification as a bearer instrument). As such, if only the Vehicle's certificate, not the Vehicle, is a pledged good subject to the Alabama Pawnshop Act's automatic forfeiture provision, then the Alabama common law, Alabama UCC, and other applicable state laws are relevant to determining the parties' respective rights in and to the Vehicle following forfeiture of the Vehicle's certificate.

As a matter of statutory interpretation, the plain language of the Alabama Pawnshop Act seemingly makes quick work of the question. The Act requires a pawnbroker's possession, and a pawnor's dispossession, of pledged good(s) at the inception of a pawn transaction. A good that secures a pawn, but that the pawnbroker allows to remain in the possession of the pawnor until the pawnbroker elects to exercise its post-default right to take possession, is not a pledged good under the Alabama Pawnshop Act. And, only pledged good(s) are subject to the Alabama Pawnshop

Act's statutory, possessory lien and the Alabama Pawnshop Act's automatic forfeiture provision, a narrow, codified exception to the anti-forfeiture rules that undergird the Alabama common law and the anti-forfeiture provisions of the Alabama UCC.

Significantly, the Alabama Supreme Court has held only that a vehicle's certificate of title is a pledged good in a title loan transaction. While some courts have concluded or assumed that vehicles in title loan transactions also are subject to characterization as pledged goods under the Alabama Pawnshop Act, the undersigned has not identified any binding precedent (state or federal) that requires this court to deviate from the Alabama Pawnshop Act's plain language to classify a vehicle in a pawnor's possession, as distinguished from the vehicle's certificate of title, as a pledged good. Accordingly, the court answers the state law question in the negative and concludes that the Vehicle is not a pledged good subject to the Alabama Pawnshop Act's automatic forfeiture provision, necessitating a determination of the parties' interests in the Vehicle under other applicable commercial laws.

The operative pawn ticket and security agreement (the "Agreement") is signed by Hambright and grants security interests in both the Vehicle and the Vehicle's unassigned certificate of title to TitleMax. A written, authenticated security agreement that grants a security interest in tangible personal property (like a vehicle) may be regarded, in Alabama, as a chattel mortgage transferring legal title (not merely a lien) to the secured party. However, under the Alabama common law (which governs to the extent not displaced by the Alabama UCC or another statute), a chattel mortgagee's legal title to mortgaged chattel is (1) *conditional* until the debtor/mortgagor defaults, (2) *defeasible* both at law and in equity until the secured party/mortgagee takes possession of the collateral, and (3) *unmerged* with the debtor/mortgagor's equity of redemption (i.e., equitable

4

title) until this equitable property interest is extinguished by foreclosure or validly transferred to the secured party after the loan's inception.

Alabama Article 9A (which applies to Alabama pawn transactions in the absence of a conflict with the Alabama Pawnshop Act) likewise treats a secured party's security interest in a good (like a vehicle) as something less than absolute title until foreclosure or a voluntary post-default transfer, regardless of the form of the security device (e.g., chattel mortgage, pledge, or conditional sale). Under Alabama Article 9A, as under the common law of chattel mortgages, a debtor retains its rights in a mortgaged good until the secured party forecloses its security interest in the good (by disposition or acceptance) or acquires or extinguishes the debtor's rights via an enforceable, post-default transfer. Moreover, just as the Alabama common law voids contractual provisions signed at a loan's inception that purport to forfeit a debtor's equity of redemption, pre-default contractual provisions that purport to forfeit a debtor's UCC redemption or surplus rights in a mortgaged good to a secured party, or to give effect to a pre-agreed strict foreclosure of a mortgaged good, are void and of no force or effect under the Alabama UCC. A contractual forfeiture, under the Alabama common law and Alabama UCC, is merely effective to render a secured party's legal title to a mortgaged good unconditional and to give the secured party the state law right to take possession of the mortgaged good and to foreclose its security interest in the good in accordance with applicable law.

Finding no conflict with the Alabama Pawnshop Act in recognizing a debtor/pawnor's common law and UCC rights and interests in a non-pledged good (i.e., a good subject to a non-possessory security interest), the court concludes that, under the Alabama UCC, Alabama common law, and the Alabama Certificate of Title Act, Hambright held both record and equitable title to the Vehicle on the bankruptcy petition date (subject to TitleMax's validly perfected, first-priority

security interest), as well as UCC surplus and redemption rights. Although the Agreement may be construed as transferring legal title to the Vehicle to TitleMax, TitleMax's legal title to the Vehicle remained conditional on the petition date, as Hambright's post-maturity grace period for repaying the secured obligation had not yet expired (and the Agreement expressly provides for forfeiture of legal title to the Vehicle only upon expiration of this grace period). Additionally, TitleMax's legal title had not yet indefeasibly vested at law or in equity because TitleMax had not yet repossessed the Vehicle or foreclosed its security interest in the Vehicle.

Because Bankruptcy Code section 362(a) enjoins affirmative enforcement action by TitleMax, and because the Vehicle is not a pledged good subject to the Alabama Pawnshop Act's automatic forfeiture provision, the petition date status quo is preserved. Furthermore, because Hambright retains possession of the Vehicle and a non-temporal redemption right (i.e., a redemption right that continues until affirmative enforcement action by the secured party, as distinguished from a redemption right that expires if the debtor fails to take action within a specified time period), the Estate's bundle of rights and interests in and to the Vehicle is one that the Eleventh Circuit Court of Appeals, and Alabama bankruptcy courts, have long regarded as functionally the equivalent of ownership under Alabama law, meaning TitleMax is the holder of a lien on the Vehicle (as said term is defined by the Bankruptcy Code), and Hambright is entitled to treat TitleMax as the holder of a claim secured by a lien on the Vehicle in her bankruptcy case.

The court's conclusions are in accord with a prior decision of the undersigned's predecessor; however, as noted above, the court's conclusions conflict with other persuasive judicial authorities. Accordingly, this opinion discusses, in detail, the statutes, decisions, and commercial law principles that inform this court's answer to the state law question, as well as the court's reasons for declining to follow the conflicting persuasive authorities. If the court's answer

to the state law question is in error, a second (predominately federal law) question arises—does the post-petition, state law forfeiture foreclose treatment of TitleMax as the holder of a secured claim in Hambright's pending chapter 13 bankruptcy case? The court examines but does not answer the question, due to the posture of the parties' litigation and the related bankruptcy case (as well as the court's answer to the aforementioned, state law question).

## II.    Procedural Posture and Jurisdiction

The plaintiff, TitleMax, commenced this adversary proceeding by filing a complaint (AP Doc. 1) (the "Complaint") against Hambright, a chapter 13 debtor in a related bankruptcy case. In the Complaint, TitleMax requests entry of a judgment determining and declaring that it owns the Vehicle and that neither Hambright nor the Estate has any interest therein, apart from a bare possessory interest. (*See id.*, *passim.*)

The Complaint is properly brought as an adversary proceeding. *See* Fed. R. Bankr. P. 7001(2), (9). Because the adversary proceeding implicates not only the rights of Hambright in and to the Vehicle but the rights of the Estate and the chapter 13 trustee in Hambright's bankruptcy case, C. David Cottingham (the "Trustee"),[3] the court joined the Trustee as a party to the adversary proceeding with the consent of TitleMax, Hambright, and the Trustee. (*See* AP Doc. 17.)[4]

Cross motions for summary judgment in the adversary proceeding are pending before the court. (*See* AP Docs. 7, 13, 17, 26, 29, 31.) In its motion, TitleMax moves for entry of a judgment declaring that legal and equitable title to the Vehicle have merged and vested in TitleMax by operation of the Alabama Pawnshop Act's automatic forfeiture provision. (*See* AP Docs. 26, 31.)

---

[3] In other words, this proceeding is *in rem*—it seeks to adjudicate not just the rights of TitleMax and Hambright vis-à-vis one another but to determine and declare the nature and extent of TitleMax's rights in the Vehicle as against Hambright, the Estate, and Hambright's other creditors.

[4] Pursuant to Federal Rule 21, as made applicable by Bankruptcy Rule 7021, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21; Fed. R. Bankr. P. 7021.

Hambright and the Trustee request entry of a judgment determining and declaring that the automatic forfeiture provision is inapplicable to the Vehicle and, therefore, that the Estate, not TitleMax, owns the Vehicle subject to TitleMax's lien. (*See* AP Docs. 7, 29.)

The material facts are stipulated or undisputed (*see* Part III, *infra*), and the questions presented are purely legal. As such, this adversary proceeding is ripe for summary disposition. *See* Fed. R. Bankr. P. 7056.

This court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334 and the United States District Court for the Northern District of Alabama's General Order of Reference dated July 16, 1984, as amended by the General Order of Reference dated July 17, 1984. TitleMax, Hambright, and the Trustee also have consented to the entry of final orders or judgment by this court. (*See* AP Doc. 18 at ¶ 2.)

## III.    The Undisputed Facts

In July 2019 Hambright was the sole owner of the Vehicle and held a valid certificate of title evidencing her ownership (the "Original Certificate"). (*See* AP Doc. 25 at ¶ 5; AP Doc. 26 at 4; AP Doc. 29 at 1-2.) To obtain a $2,000.00 short-term (30-day), non-recourse, non-purchase money loan from TitleMax, Hambright executed an agreement that, among other things, granted TitleMax a security interest in her Vehicle and the Vehicle's certificate of title and provided for Hambright's pledge of the Original Certificate. (*See* AP Doc. 25 at ¶ 6; AP Doc. 26 at 4; AP Doc. 29 at 2.) Hambright delivered the Original Certificate to TitleMax at the loan's inception. (*See* AP Doc. 25 at ¶¶ 6-7; AP Doc. 29 at 2.)

To comply with the perfection requirements of Alabama Article 9A (*see* Ala. Code § 7-9A-311) and the Alabama Certificate of Title Act (*see* Ala. Code §§ 32-8-61, 32-8-62), TitleMax relinquished the Original Certificate to the Alabama Department of Revenue and made application

for a new certificate of title recording its status as lienholder. (*See* AP Doc. 13, Ex. A at 2.) On or about September 9, 2019 (within the original 30-day loan term), the Alabama Department of Revenue issued the requested certificate (the "Replacement Certificate"), recording TitleMax as the first lienholder. (*See* AP Doc. 13, Ex. A at 2; AP Doc. 25 at ¶ 12.) No party alleges that Hambright executed the assignment and warranty of title section (*see* Ala. Code § 32-8-44) of the Original Certificate or the Replacement Certificate (i.e., there is no allegation that Hambright endorsed either certificate).

Hambright renewed her loan with TitleMax multiple times, with the parties treating each renewal as a new loan. (AP Doc. 25 at ¶ 14; AP Doc. 26 at 4; AP Doc. 29 at 2.) At the time of each renewal, Hambright paid the outstanding charges and refinanced the principal balance owed, from time to time borrowing additional sums. (*See id.*) The latest renewal occurred shortly before Hambright's bankruptcy filing, with TitleMax loaning $6,739.14 to refinance the outstanding balance on Hambright's prior agreement (the "Loan"). (*See* AP Doc. 13, Ex. A at 3; AP Doc. 25 at ¶ 16; AP Doc. 26 at 4; AP Doc. 29 at 2.) The Loan is evidenced by a certain pawn ticket and security agreement executed by Hambright in favor of TitleMax (heretofore referred to as the "Agreement"), a copy of which is filed in the AP. (*See* AP Doc. 13, Ex. A at 3-9.)

The Agreement references the Original Certificate, but generally describes the pawned/pledged good as the Vehicle's certificate of title. (*See id.* at 4, ¶¶ 1, 3.) The Vehicle is not specifically identified as a "pledged good" in the Agreement. (*See id.* at 3-9.) However, the Agreement does purport to forfeit Hambright's right, title, and interest in and to the Vehicle to TitleMax if Hambright "fail[s] to redeem the Vehicle" within 30 days of the Loan's maturity date, and the Vehicle is described as "pledged" in a paragraph entitled "Lost Pawn Ticket". (See *id.* at 4, ¶¶ 6, 9.) The Loan is non-recourse—i.e., contractually, Hambright is not obligated for the Loan

9

personally, and TitleMax must look to its collateral to satisfy the debt if not voluntarily repaid. (*See id.* at 4, ¶ 6; AP Doc. 25 at ¶ 9.)

The Agreement's stated maturity date is the 30th day after the date of the Loan. (*See* AP Doc. 13, Ex. A at 4, ¶ 1.) Stated as an annual rate, the cost of the credit to Hambright is listed as 145.88 percent. (*See id.* at 3.) Failure to repay the Loan within 30 days after the maturity date is a default under the Agreement, contractually entitling TitleMax to peaceably repossess the Vehicle. (*See id.* at 4, ¶ 8.) The Agreement permits, but does not require, Hambright's voluntary surrender of the Vehicle at any time, giving Hambright the contractual right to retain possession until TitleMax elects its remedy of repossession. (*See id.* at 4, ¶ 7.) Pursuant to the Agreement, Hambright is "liable for Vehicle damage and loss…" and holds TitleMax "harmless for all claims and costs arising from [her] using the Vehicle, including all judgments, attorneys' fees, court costs and expenses." (*See id.* at 8, ¶ 22(l); AP Doc. 25, Ex. A at 6, ¶ 22(l).)

Five days after the Loan's stated maturity date, but prior to expiration of the contractual grace period for repaying the Loan, Hambright filed her chapter 13 bankruptcy petition. (*See* AP Doc. 13, Ex. A at 3; BK Doc. 1.) TitleMax had not yet repossessed the Vehicle at the time of the filing. (*See* AP Doc. 25 at ¶ 7; AP Doc. 26 at 4; AP Doc. 29 at 2.) Hambright, at all relevant times, has retained actual possession of the Vehicle. (*See id.*) In this adversary proceeding, TitleMax expressly disclaims any theory of its constructive possession of the Vehicle, stating "Plaintiff is not arguing that it constructively held possession of the [V]ehicle through the title." (*See* AP Doc. 31 at 3.)

Neither Hambright nor the Trustee has repaid the Loan. (*See* AP Doc. 25 at ¶ 19.) Hambright's chapter 13 plan proposes to treat TitleMax as fully secured and pay TitleMax the

10

present value of its entire claim. (*See id.* at ¶ 21; BK Doc. 41 at 2-3.) TitleMax has filed an objection to this proposed treatment in Hambright's bankruptcy case. (*See* BK Doc. 51, *passim*.)

## IV.    Analysis

### A.    *The Big Picture*

#### i.    <u>The Estate</u>

State and federal law are relevant to defining the relationships of the parties to the Vehicle (and to one another), both as of the date Hambright commenced the bankruptcy case and now. This is due, in large part, to the fact that Hambright's bankruptcy filing gave rise to the Estate. *See* 11 U.S.C. § 541(a). The Estate is a legal entity. *See id.*; *In re Woerner*, 783 F.3d 266, 271 (5th Cir. 2015). The Estate's interests are protected in Hambright's bankruptcy case in a variety of ways (*see, e.g.*, 11 U.S.C. §§ 327(a), 1307(c)), and duties (including fiduciary duties) are owed to the Estate. *See, e.g., id.* §§ 323, 1302.

What is (and is not) property of a bankruptcy estate at any given point in time is a question of federal law and is impacted by myriad Bankruptcy Code sections. *See, e.g., id.* § 541(a) ("The commencement of a case…creates an estate…comprised of all the following property, wherever located and by whomever held…"); *id.* § 1306(a) ("Property of the estate includes, in addition to the property specified in section 541 of this title—(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted…; and (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted…"); *id.* § 1327(b), (c) ("(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor…[and] (c)…the property vesting in the debtor…is free and clear of any claim or interest of any creditor provided for by the

Case 20-70016-JHH    Doc 57    Filed 02/04/22    Entered 02/04/22 16:35:13    Desc Main
Document      Page 11 of 85

plan."); *id.* § 348(f)(1) ("Except as provided in paragraph (2), when a case under chapter 13 of this title is converted to a case under another chapter under this title—(A) property of the estate in the converted case shall consist of property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the date of conversion…"); *id.* § 349(b)(3) ("Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title…revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case…"); *id.* § 554(d) ("Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.").  Generally speaking, "the date of filing of the bankruptcy petition operates as a date of cleavage when property of the debtor owned on that date passes into the estate and after-acquired property remains with the debtor."  Klee & Holt, Bankruptcy and the Supreme Court:  1801-2014 at 205 (2015) (internal citations omitted). *But see, e.g.*, 11 U.S.C. § 1306(a) (adding post-petition property interests to the estate in chapter 13 cases); *In re Waldron*, 536 F.3d 1239, 1243 (11th Cir. 2008) (holding that property interests acquired by a chapter 13 debtor post-confirmation vest in the bankruptcy estate).

With limited exceptions, an estate's "property" includes "all legal or equitable interests of the debtor in property as of the commencement of the case," as well as "proceeds, product, offspring, rents, or profits of or from property of the estate."  *See* 11 U.S.C. § 541(a)(1), (6).  This may be an abstract distinction, but, under Bankruptcy Code section 541, "property of the estate" refers to the debtor's bundle of rights and interests in and to various categories of things, whereas, in other Bankruptcy Code sections, "property" may refer to such rights or interests or to the things that are subject to such rights or interests.  *See id.* § 541(a); *see also Schwab v. Reilly*, 560 U.S. 770, 782 (2010) (holding that Bankruptcy Code section 522(d) refers to a debtor's "interests" in

12

the assets categorically described, not the assets themselves). By way of example, a car leased by a debtor often is referred to as property of the estate; however, it is perhaps more precise to say that the debtor's petition date property interest and rights—the leasehold and its attendant rights of possession and use (i.e., the debtor's bundle of rights and interests in and to the vehicle)—are the estate's property. Even an arguable right to possession is property. *Fed. Deposit Ins. Corp. v. Morrison*, 747 F.2d 610, 614 (11th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985) (citing *Fuentes v. Shevin*, 407 U.S. 67, 86, n.16 (1972)). And the Bankruptcy Code casts a wide net, bringing all "property" into the estate absent an exclusion. *See* 11 U.S.C. § 541. Of course, while the Bankruptcy Code defines the composition of an estate, non-bankruptcy law (typically state law) creates and defines the rights and interests that enter the estate. *See Butner v. U.S.,* 440 U.S. 48, 55 (1979). In other words, the property acquired by a bankruptcy estate from a debtor, by operation of federal bankruptcy law, depends on non-bankruptcy law for its existence. *See* Klee & Holt, at 207.

Twin policies underpin federal bankruptcy law: (1) "to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition" and (2) "to leave the bankrupt free after the date of his petition to accumulate new wealth in the future…and thus make an unencumbered fresh start." *Kokoszka v. Belford*, 417 U.S. 642, 646 (1974) (internal citations omitted); *see also Toibb v. Radloff*, 501 U.S. 157, 163-64 (1991) (discussing the Bankruptcy Code's general "policy of maximizing the value of the bankruptcy estate" and "deriving as much value as possible from the debtor's estate"); *Loc. Loan Co. v. Hunt*, 292 U.S. 234, 244-45 (1934) (stating that "[o]ne of the primary purposes of the Bankruptcy Act [was] to 'relieve the honest debtor from the weight of oppressive indebtedness'") (internal citations omitted). In a chapter 7 case, the trustee liquidates property of the estate—to the extent the estate's

13

property has realizable value—and distributes the monies collected in accordance with the Bankruptcy Code's priority scheme. *See* 11 U.S.C. §§ 704, 726. In a chapter 13 case, the trustee is not tasked with liquidating the estate's property (*see id.* § 1302), and the debtor is afforded the exclusive right to use, sell, or lease property of the estate under Bankruptcy Code section 363. *See id.* § 1303. However, a chapter 13 plan is not confirmable if the debtor's unsecured creditors will receive less under the plan than they would in a chapter 7 liquidation. *See id.* § 1325(a)(4). Thus, the Bankruptcy Code seeks to protect and enhance bankruptcy estates in several ways, to benefit both the debtor and the debtor's creditors and to facilitate the Bankruptcy Code's distributive scheme.

By way of example, Bankruptcy Code section 362(a) stays acts to take property of or from an estate. The stay is intended to protect both debtors and creditors:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions...The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97.

Chapter 5 of the Bankruptcy Code also arms a trustee—or a debtor exercising the powers of a trustee (*see generally* 11 U.S.C. §§ 1107, 1203)—with various federal rights and powers intended to enhance and preserve bankruptcy estates (and facilitate a debtor's fresh start), ranging from the rights of a hypothetical judicial lienholder (*see id.* § 544(a))[5] to a federal right to

---

[5] A trustee's lien on property of a bankruptcy estate is a federally created interest in the estate's property that is distinct from the interests acquired by the estate from the debtor; however, the validity, priority, and extent of a trustee's lien largely depends on applicable non-bankruptcy law. *See id.* § 544(a)(1) ("The trustee shall have, as of the

14

possession of property that a trustee or debtor may use, sell, or lease under Bankruptcy Code section 363, or that the debtor may exempt under Bankruptcy Code section 522. *See* 11 U.S.C. § 542(a); *see also U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 207 (1983) ("In effect, § 542(a) grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings."). In some instances, chapter 7 and chapter 13 debtors may exercise these powers. *See, e.g.*, 11 U.S.C. § 522(h).

Among the most significant of the chapter 5 rights and powers are the "avoiding" powers. For instance, Bankruptcy Code sections 547 and 548 allow for avoidance of certain pre-petition transfers, and Bankruptcy Code section 552 invalidates certain after-acquired property clauses in pre-petition security agreements without the necessity of an avoidance action. *See* 11 U.S.C. §§ 547, 548, 552. Potentially relevant to the parties' dispute in this proceeding and the related bankruptcy case is Bankruptcy Code section 549, which allows for avoidance of unauthorized, post-petition transfers of estate property. *See id.* § 549.

Ordinarily, if a post-petition transfer of estate property is not authorized by the Bankruptcy Code or court order, it may be avoided. *See id.* § 549; *In re Delco Oil, Inc.*, 599 F.3d 1255, 1258-

---

commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such creditor exists"); *see also* Ala. Code § 6-9-40(2), (3) (stating that executions may be levied on personal property of the defendant, except things in action, whether he has absolute title thereto or the right only to possession for a period of time and also that an equity of redemption in personal property is subject to levy, but stating that "[w]hen any interest less than the absolute title is sold, the purchaser is subrogated to all the rights of the defendant and subject to all his disabilities."); *id.* § 6-9-211 (stating that a judgment lien attaches to "all property of the defendant which is subject to levy and sale under execution"); *id.* § 32-8-39(e) (stating that a "certificate of title to a vehicle is not subject to garnishment, attachment, execution or other judicial process, but this subsection does not prevent a lawful levy upon the vehicle"). If a trustee's lien attaches to estate property, the trustee's lien enables the trustee to subordinate interests that are junior to the trustee's lien (*see, e.g., id.* § 7-9A-317) and also to assert the rights and remedies of a junior lienholder in respect of any senior lienholder (including, without limitation, a junior lienholder's right to make demand for surplus proceeds, *see id.* § 7-9A-608, and a junior lienholder's right to request notice of and an opportunity to object to a strict foreclosure, *see id.* §§ 7-9A-620, 7-9A-621). *See* 11 U.S.C. § 541(a)(1). Neither the Trustee nor Hambright has invoked the Trustee's rights or powers under Bankruptcy Code section 544(a) in this proceeding, as such the court does not herein address the impact of the alleged forfeiture on the Trustee's lien on the Vehicle (if any).

59 (11th Cir. 2010) ("To avoid a transfer under [s]ection 549(a) a trustee need only demonstrate: (1) a post-petition transfer (2) of estate property (3) which was not authorized by the Bankruptcy Code or the court…After the trustee makes that showing, the party asserting an established transfer's validity bears the burden of proving it valid.") (internal citations omitted); *see also* Fed. R. Bankr. P. 6001 ("Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof.").  Furthermore, if the transfer of a bankruptcy estate's interest in property is avoided, the trustee (or debtor) may recover the property or its value from the transferee (provided the estate will benefit from the recovery).  *See* 11 U.S.C. § 550(a).  Notably, while there are limitations on the Bankruptcy Code section 549 avoidance power (*see generally id.* § 549(d)), section 549 does not, on its face, require that avoidance benefit the estate if the purpose of avoidance is merely to unwind the post-petition transfer of an interest in property in the possession of the estate's representative, and not to recover the property or its value from a transferee. *Compare id.* § 549(a) ("Except as provided in subsection (b) [which applies to involuntary bankruptcies] or (c) [which applies to transfers of interests in real property to good faith purchasers without knowledge of the bankruptcy], the trustee may avoid a transfer of property of the estate— (1) that occurs after the commencement of the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by the court") *with id.* § 550(a) ("Except as otherwise provided in this section, to the extent that a transfer is avoided under…549…of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property…").  Further, avoidance of a post-petition transfer may upset state law rights and priorities.  *See, e.g.*, *Delco Oil*, 599 F.3d at 1260.

The Bankruptcy Code broadly defines "transfer," stating that "[t]he term 'transfer' means – (A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a

16

debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property." *See* 11 U.S.C. § 101(54). This means even post-petition transfers that are not void as violative of the stay[6] may be avoidable if not authorized by the Bankruptcy Code or bankruptcy court. *See, e.g.*, *In re Forman Enters., Inc.*, 273 B.R. 408, 416 (Bankr. W.D. Pa. 2002) ("Nowhere is there any indication in the Bankruptcy Code that action, as opposed to inaction, by a debtor is required for there to be a transfer."). The Bankruptcy Code section 549 avoidance power is among the chapter 5 powers that a chapter 13 debtor may exercise if the chapter 13 trustee does not. *See* 11 U.S.C. § 522(h).

Ultimately, bankruptcy estates are creatures of federal bankruptcy law, and, therefore, the Bankruptcy Code has a lot to say about them. Of the 300-plus Bankruptcy Code provisions, more than 200 mention the estate. A fundamental policy of statutory interpretation is that Bankruptcy Code provisions must be construed to give effect to the entire statutory scheme. *See* Klee & Holt, at 19-20, 26-27, n.98 (internal citations omitted). Thus, Bankruptcy Code sections may not be read in isolation, and questions regarding the composition of a bankruptcy estate at any given point in time cannot be answered solely by reference to Bankruptcy Code section 541 (or any single Bankruptcy Code provision). Moreover, "[t]he idea that state law determines property rights was, and still is, of great importance in the structure of bankruptcy law, but it was never an absolute."

---

[6] In the Eleventh Circuit, actions that violate the stay are void and without effect (not merely voidable). *See Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982). However, the Eleventh Circuit has construed 362(a) as enjoining only affirmative acts, and the United States Supreme Court also has so held when construing Bankruptcy Code section 362(a)(3). *See City of Chicago v. Fulton*, 141 S. Ct. 585, 590-92 (2021) (holding that a secured party's retention of collateral did not violate the stay of section 362(a)(3)); *In re Northington*, 876 F.3d 1302, 1313-14 (11th Cir. 2017) (holding that the stay of section 362(a) does not toll an "as-yet-unexpired state-law redemption period indefinitely"). Therefore, although Bankruptcy Code section 362(b)(24) provides that *actions* that effect avoidable post-petition transfers are not excepted from the stay of section 362(a), the Eleventh Circuit's holding in *Northington* may compel the conclusion that transfers that occur automatically by operation of state law, and without any affirmative conduct by a secured party, are not violative of the stay and, therefore, are not void *ab initio*. *See Northington*, 876 F.3d at 1313-14.

*See* Grant Gilmore, SECURITY INTERESTS IN PERSONAL PROPERTY § 45.2, at 1284 (1965). "Property rights do not gain any absolute inviolability in the bankruptcy court because created and protected by state law. Most property rights are so created and protected. But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect these property rights, provided the limitations of the due process clause are observed." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 518 (1938).

The foregoing notwithstanding, state law can, and does, significantly impact the rights of, and relief available to, debtors and creditors in bankruptcy and the value of bankruptcy estates. The Bankruptcy Code's incorporation of and deference to state law exemptions offers a stark example of how impactful state law can be in bankruptcy. *See* 11 U.S.C. § 522(b). *Compare* Ala. Code §§ 6-10-2, 6-10-12 (setting an individual's homestead exemption at $15,000, subject to adjustment on July 1, 2017 and at the end of each three-year period thereafter)[7] *with* Fla. Const. art. X, §4 (establishing a virtually limitless homestead exemption). Even in states where the codifications of the UCC are virtually identical, bankruptcy treatment of secured parties may vary significantly because the UCC does not purport to entirely displace the common law that preceded its codification, and other state statutes may supersede or supplement its provisions. *Compare In re Rozier*, 376 F.3d 1323 (11th Cir. 2004) (holding that, under Georgia law, a chapter 13 debtor's estate holds a sufficient property interest in a vehicle repossessed by a secured party pre-bankruptcy to compel turnover of the vehicle to the debtor under Bankruptcy Code section 542) *with In re Lewis*, 137 F.3d 1280 (11th Cir. 1998), *reh'g denied*, 149 F.3d 1197 (11th Cir. 1998)

---

[7] Presently, the homestead exemption that an individual may claim is $16,450. *See* Office of State Treasurer for the State of Alabama, Resources, CPI Information *available at* https://treasury.alabama.gov/cpi-information/ (last visited November 19, 2021).

(reaching the opposite conclusion under Alabama law, based on the Alabama common law's treatment of a chattel mortgagee's legal title as vested, at law, upon default and repossession).[8]

### ii. Secured Claims in Bankruptcy; the Federal Definitions

Importantly, in bankruptcy, "lien," "security interest," "security agreement," "debt," "claim," and "creditor" are federally defined terms. Lien is defined broadly as a "charge against or interest in property to secure payment of a debt or performance of an obligation." *See* 11 U.S.C. § 101(37). A lien created by an agreement is a "security interest," and an agreement that creates or provides for a security interest is a "security agreement." *See id.* § 101(50), (51). A defining characteristic of a "lien" is that it secures payment of a "debt," which is defined as liability on a "claim." *See id.* § 101(12). "Claim" is defined broadly, as "any right to payment" (be it legal,

---

[8] In *Lewis*, the Eleventh Circuit Court of Appeals held that a debtor's statutory (non-temporal) UCC right of redemption is an insufficient interest in a vehicle (under the Alabama common law and Old Alabama Article 9) to compel a secured party's turnover of the vehicle under Bankruptcy Code section 542(a). 137 F.3d at 1284. To support this holding, and to reconcile it with the United States Supreme Court's holding in *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983) that a secured party can be compelled to turnover collateral in its possession under Bankruptcy Code section 542 (*see id.* at 205-06), the Eleventh Circuit pointed to Alabama cases involving claims for conversion (i.e., trover). *See Lewis,*137 F.3d at 1283. Specifically, the Circuit, in *Lewis*, considered it pertinent that, after the adoption of the Alabama UCC in 1965, the Alabama Court of Civil Appeals continued to point to the common law's treatment of a chattel mortgagee's legal title as unconditional upon default and vested, at law, upon possession, to hold that a chattel mortgagor cannot maintain a conversion claim against a chattel mortgagee for the mortgagee's post-default repossession of the mortgaged chattel. *See id.* (citing *Am. Nat'l Bank, & Tr. Co. of Mobile v. Robertson*, 384 So. 2d 1122 (Ala. Civ. App. 1980) and *Pierce v. Ford Motor Credit Co.*, 373 So. 2d 1113 (Ala. Civ. App. 1979)); *see also Harmon v. Dothan Nat'l Bank*, 64 So. 621, 622 (Ala. 1914) ("Under the theory of mortgages prevailing in this state, nothing can be clearer than the proposition that after default the legal title of the mortgage is perfect. Indeed, foreclosure adds nothing to the legal title, and its only office and value is to cut off the equity of redemption. The mortgagee's legal title carries, of course, the right of possession, and, in the case of chattels, possession taken by the mortgagee after default leaves in the mortgagor no interest except an equity of redemption—which is cognizable and enforceable only in a court of equity"); *see also Auto. Acceptance Corp. v. Powell*, 234 So. 2d 593, 600 (Ala. Civ. App. 1970) ("Under our law, appellant was within his rights to repossess the property…It follows then that the appellee could not maintain an action for conversion since he had no legal title to the auto, and no immediate right to possession of the auto"). Without discussing whether the subject secured credit transaction was properly characterized as a chattel mortgage, or expressly considering the significance of the chattel mortgagor's equity of redemption, the Eleventh Circuit summarily concluded that, after default and repossession, the debtor did "not retain title, possession or any other functionally equivalent ownership interest in the repossessed automobile," and went on to state, "we readily conclude that [the debtor's] statutory right of redemption in the automobile became 'property of the estate'…We are not convinced, however, that the mere existence of the estate's ability to redeem the automobile renders the automobile itself 'property of the estate,' at least to the extent that it should be turned over pursuant to 11 U.S.C. § 542(a)." *See Lewis*, 137 F.3d at 1284.

19

equitable, secured, unsecured, liquidated, contingent, etc.) or "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." *See id.* § 101(5). The definition encompasses both recourse and non-recourse obligations (i.e., obligations enforceable against a debtor's property only, not the debtor personally). *See Johnson v. Home State Bank*, 501 U.S. 78, 85-86 (1991); *Matter of Lindsey, Stephenson & Lindsey*, 995 F. 2d 626, 627-28 (5th Cir. 1993), *cert. denied*, 510 U.S. 1111 (1994) (citing *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552 (1990)); *In re Saylors*, 869 F.2d 1434, 1436 (11th Cir. 1989); *see also* 11 U.S.C. § 102(2) (stating that "'claim against the debtor' includes claim against property of the debtor"); *id.* § 1111(b). A claim holder is a "creditor" under the Bankruptcy Code if its claim "arose at the time of or before the order for relief concerning the debtor" (*see id.* § 101(10)), or if its claim is deemed to have "arisen before the date of the filing of the petition." *See, e.g.*, *id.* § 502(g); *id.* § 1305(b).

Generally speaking, a creditor's claim is not regarded as a secured claim in a bankruptcy case unless the claim is "secured by a lien on property in which the estate has an interest." *See id.* § 506(a)(1).[9] Bankruptcy Code section 506 does not refer to "property of the estate" in defining who is and is not the holder of a secured claim. *See* 11 U.S.C. § 506(a). Instead, and consistent with Bankruptcy Code section 541's references to the debtor's rights and interests in things as the estate's property (and not the things themselves), section 506(a) treats as the holder of a secured claim any creditor with "a lien on property *in which the estate has an interest*, or that is subject to setoff under section 553 of this title,…to the extent of the value of such creditor's interest in the estate's interest in such property." *See id.* § 506(a)(1) (emphasis added). A debtor's exemptions

---

[9] When section 506(a) is inapplicable (*see, e.g.*, the hanging paragraph of section 1325(a)(5)), Bankruptcy Code section 1325(a)(5) has been construed as referring (more broadly) to claims that are "allowed" and "secured by a lien." *See In re Dean*, 537 F.3d 1315, 1320 (11th Cir. 2008) (holding that a 910-creditor held an allowed secured claim under section 1325(a)(5) and was entitled to be paid the present value of its entire claim).

do not impact the value of a creditor's secured claim for purposes of section 506(a) if the creditor's lien is not subject to avoidance. *See generally id.* § 522(c).

For the most part, the Bankruptcy Code endeavors to treat similarly situated creditors similarly. Thus, with limited exceptions (like the anti-modification provision applicable to a creditor holding a claim that is secured only by a lien on real property that is the debtor's principal residence, *see id.* § 1322(b)(2), and the exclusion to Bankruptcy Code section 506 applicable to a creditor that holds a purchase money security interest in a vehicle purchased within 910 days of the bankruptcy petition date, *see id.* § 1325(a)(5)'s hanging paragraph), the allowed amount of an undersecured creditor's secured claim may be "stripped down" to the value of the creditor's collateral in a chapter 13 plan (provided the debtor is eligible for a discharge). *See id.* § 506(a); *id.* § 1325(a)(5); *In re Paschen*, 296 F.3d 1203, 1205-07 (11th Cir. 2002), *cert. denied*, *Am. Gen. Fin. v. Paschen*, 537 U.S. 1097 (2002). Further, if a creditor's collateral has no value (because the collateral is worthless or senior lien(s) equal or exceed the collateral's value), the creditor's claim may be treated as entirely unsecured, and the creditor's lien discharged without payment, i.e., "stripped off," even if the lien encumbers only real property that is the debtor's principal residence. *See* 11 U.S.C. §§ 506(a), 1322(b)(2); *In re Scantling*, 754 F.3d 1323, 1329-30 (11th Cir. 2014). In certain instances, involuntary liens and even some voluntary liens are avoidable to preserve and enhance the value of an individual debtor's claimed exemptions. *See* 11 U.S.C. § 522(f). Additionally, the post-confirmation interest payable to the holder of an allowed secured claim in chapter 13 typically is based on a present value analysis—i.e., the debtor must ensure the plan pays the creditor the present value of its secured claim—not the parties' contract interest rate. *See id.* § 1325(a)(5)(B)(ii); *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004). In other words, the Bankruptcy Code arms reorganizing individuals (like reorganizing entities) with a variety of tools

to compel restructuring of their secured (and unsecured) debts on more favorable, and more affordable, terms.

Like the UCC (*see, e.g.*, Ala. Code § 7-9A-202, cmt. 3(b)), the Bankruptcy Code largely eschews questions of title for purposes of determining whether a person or entity is the holder of a lien, making no distinction between "title theory" and "lien theory" states. *See* 11 U.S.C. § 101(37), (50), (51) (defining "lien," "security interest," and "security agreement"); *see also id*. § 506.[10]  Notably, in a case upholding the constitutionality of a Bankruptcy Act provision that indefinitely tolled a debtor's statutory right to redeem property post-foreclosure, the United States Supreme Court held that the interests of the foreclosure sale purchaser were subject to adjustment in bankruptcy, explaining:

---

[10] The court does not mean to suggest that the title-lien distinction in secured credit transactions is, or ever was, entirely irrelevant in bankruptcy, as the Eleventh Circuit's continued reliance on such distinctions in *Lewis* highlights. However, it warrants mention that the UCC was structured to minimize the importance of such distinctions. Writing in 1965 (prior to the enactment of the Bankruptcy Code), Grant Gilmore, one of the original draftsmen of UCC Article 9, observes in his comprehensive treatise on pre- and post-UCC personal property security devices, SECURITY INTERESTS IN PERSONAL PROPERTY: "The distinction between lien and title, although it has never bulked as large in the personal property security field as it has, and perhaps still does, in the field of real property mortgages, was relevant in the nineteenth century in a number of situations.  In [the 20th century] the only relevance of title theory with respect to security transactions has been in connection with petitions for reclamation in bankruptcy proceedings—that is, demands that the trustee in bankruptcy physically deliver to the claimant the property covered by the petition." Gilmore § 11.8, at 365.  Gilmore goes on to explain later in the treatise: "Section 9-202 and the accompanying comment make clear that the Article 9 security interest is not, conceptually, a title device…Thus the distinction occasionally drawn in the scattered bankruptcy case law between 'title devices' and 'mere liens,' with respect to the granting or denial of the secured creditor's petition in reclamation, no longer has any basis in state law." *See id.* § 44.9.1, at 1254.  Notably, in 1935, the Second Circuit Court of Appeals held that property sold to a debtor under a conditional sales contract was not "property of the debtor" until the purchase price was paid and, therefore, was not a part of the subject-matter of the debtor's reorganization under the Bankruptcy Act; accordingly, the conditional seller was permitted to reclaim the property. *See In re Lake's Laundry, Inc.*, 79 F.2d 326, 328 (2d Cir. 1935), *cert. denied*, 296 U.S. 622 (1935).  However, in 1966 (after the UCC's adoption in 47 states), the Second Circuit repudiated its holding in *Lake's Laundry*. *See In re Yale Express Sys., Inc.*, 370 F.2d 433, 437-38 (2d Cir. 1966) ("Since the Uniform Commercial Code has abolished the technical distinctions between the various security devices, the federal bankruptcy courts should no longer feel compelled to engage in the purely theoretical exercise of locating 'title;' nor should considerations of where 'title lies' influence the courts in the exercise of their equitable discretion.").  Thus, the Honorable Learned Hand astutely foreshadowed the diminished importance of where title lies in secured credit transactions in bankruptcy in his dissent in *Lake's Laundry*:  "It seems to me a barren distinction, though indubitably true, that title does not pass upon a conditional sale; 'title' is a formal word for a purely conceptual notion; I do not know what it means and I question whether anybody does, except perhaps legal historians. The relations resulting from conditional sales are practically the same as those resulting from mortgages; I would treat them as the same when we are dealing with the reorganization of the debtor's property."  *Lake's Laundry*, 79 F.2d at 328-29.

22

> While there may be no relation of debtor and creditor between the bankrupt and the purchaser of his property at judicial sale, we think the purchaser at a judicial sale does enter into the radius of the bankruptcy power over debts. His purchase is in the liquidation of the indebtedness. The debtor has a right of redemption of which the purchaser is advised, and until that right of redemption expires the rights of the purchaser are subject to the power of the Congress over the relationship of debtor and creditor and its power to legislate for the rehabilitation of the debtor. The person whose land has been sold at foreclosure sale and now holds a right of redemption is, for all practical purposes, in the same debt situation as an ordinary mortgagor in default; both are faced with the same ultimate prospect, either of paying a certain sum of money, or of being completely divested of their land. We think the provision for the extension of the period of redemption comes clearly within the power of the Congress under the bankruptcy clause.

*Wright*, 304 U.S. at 514–15. This is not to say that a mortgage foreclosure sale purchaser is subject to treatment as the holder of a claim secured by a lien on the mortgaged property under the Bankruptcy Code. *See infra*, pp. 25-26. Redemption rights of a stated duration are not indefinitely tolled by the Bankruptcy Code. *See generally* 11 U.S.C. § 108(b); *In re Northington*, 876 F.3d at 1313 (concluding that section 362(a) does not toll the running of a temporal redemption period beyond the timeframes set forth in section 108(b)).[11] But, as the United States Supreme Court's ruling in *Wright* highlights, while federal courts generally are loathe to upset parties' state law expectations, federal bankruptcy law can and does, in many instances, do just that, and state law alone does not determine whether a creditor's interest in property is subject to characterization as a Bankruptcy Code lien or whether the creditor is subject to treatment as holder of a secured claim.

---

[11] Whether a debtor may extend, via a chapter 13 plan, a temporal redemption period that is tied to a payment default, and the expiration of which triggers a post-petition transfer of a property interest of the estate, is a separate question that is not explicitly addressed by *Northington*. *See id.* at 1305-26 (concluding section 1322(b)(2) was inapplicable upon expiration of the debtor's temporal redemption period, without discussing whether or not the debtor might have extended the redemption period under section 1322(b)(3), or whether the resulting forfeiture of the debtor's interests in the vehicle, if any, was an authorized post-petition transfer); *see generally* 11 U.S.C §§ 1322(b)(2)-(3). The dispute in this proceeding concerns what Estate rights or interests in the Vehicle were forfeited to TitleMax (if any) upon the post-petition expiration of the Alabama Pawnshop Act's temporal period for Hambright to redeem the pledged good(s) securing the Loan. Because the court concludes that only the Replacement Certificate, not the Vehicle, is subject to characterization as a pledged good under the Act (and, therefore, that the Estate retains its statutory and equitable non-temporal redemption rights in and to the Vehicle), the court need not consider whether Hambright's chapter 13 plan can or does operate to extend Hambright's temporal redemption period for redeeming the Replacement Certificate.

23

Necessarily, any federal court decisions that interpret state law as carving out certain secured debts from restructuring in bankruptcy are consequential. This is not because the result in bankruptcy differs from that at state law—more often than not, state law does not give a defaulting debtor the right to retain possession of collateral or allow a debtor to pay less than the entire secured obligation to discharge a creditor's lien on, or legal title to, collateral or concern itself with equitably distributing a debtor's assets among the debtor's creditors in accordance with the federal law priority scheme. It is because the result is to give preferential treatment to some secured creditors in bankruptcy, to deprive debtors of use of their federal bankruptcy toolkit for obtaining a fresh start, and (in some instances) to allow secured parties to realize equity in collateral (to the detriment of debtors and, potentially, unsecured creditors). None of the foregoing results are consistent with the broad policies underpinning the Bankruptcy Code. This does not mean that such results are wrong, but it does mean that the court must take care to consider the impact of federal law on parties' state law rights, as well as to define the parties' rights in accordance with both federal bankruptcy law and applicable non-bankruptcy law.

        iii.     The State Law Impact on the Federal Definitions

Importantly, although "lien" is a federally defined term, how non-bankruptcy law characterizes a party's interest in property, and the party's relationship to the debtor as a matter of non-bankruptcy law, necessarily informs the federal definition. For instance, if state law characterizes a transaction as a true lease, not a secured credit transaction, the lessor cannot be treated in bankruptcy as a lienholder because the lessor's interest is not charged with payment of a debt (i.e., the lessor's interest in the leased property is not subject to extinguishment or divestment by payment of an obligation).

24

In the Eleventh Circuit, the temporal right to redeem real property post-foreclosure, under Alabama Code section 6-5-248, is not a sufficient interest in the mortgaged property to relegate the foreclosure sale purchaser to treatment as the holder of a modifiable secured claim. *See In re Smith*, 85 F.3d 1555, 1557-61 (11th Cir. 1996) (following *In re Glenn*, 760 F.2d 1428, 1435-36 (6th Cir. 1985)). Alabama law characterizes this post-foreclosure statutory redemption right as a personal privilege, not property or a property right (*see* Ala. Code § 6-5-250); nevertheless, the statutory redemption right is regarded, under federal bankruptcy law, as a property interest in the foreclosed property that passes to the bankruptcy estate under Bankruptcy Code section 541. *See Wragg v. Fed. Land Bank*, 317 U.S. 325, 328-29 (1943) (holding the Alabama statutory right to redeem realty post-foreclosure is an interest in mortgaged property that may be administered in bankruptcy, notwithstanding the Alabama state legislature's denomination of the right as a mere personal privilege and not a property right); *see also Smith*, 85 F.3d at 1558. Furthermore, the mortgage foreclosure sale purchaser can still be divested of its title by a redemptioner's timely payment of the foreclosure sale purchase price, lawful charges, and, if the purchaser owns the debt for which the mortgaged property was sold, the balance of the mortgage debt with interest. *See* Ala. Code § 6-5-253(a); *id.* § 6-5-255. Additionally, a mortgagee that takes title at a mortgage foreclosure sale may have a claim in the mortgagor's bankruptcy case (e.g., for any post-foreclosure deficiency) and must disburse any profits realized from the mortgagee's sale of the foreclosed property during the statutory redemption period to the reduction of the mortgagor's debt. *See Springer v. Baldwin Cnty. Fed. Sav. Bank (Springer I)*, 562 So. 2d 138, 139-40 (Ala. 1989); *Springer v. Baldwin Cnty. Fed. Sav. Bank (Springer II)*, 597 So. 2d 677, 677-78 (Ala. 1992). Nevertheless, for various pragmatic reasons, the Sixth Circuit determined, in *Glenn*, that a debtor's right to waive or cure the mortgage default under section 1322(b) ends upon the sale of the

25

mortgaged premises (regardless of whether the mortgagee or a third party takes title at the foreclosure sale), and the Eleventh Circuit, in *Smith*, agreed. *See Glenn*, 760 F.2d at 1435-36; *see also Smith,* 85 F.3d at 1555.

In *Smith*, the Eleventh Circuit also cited favorably *In re McKinney*, 174 B.R. 330 (S.D. Ala. 1994) (Mahoney, J.). *See Smith*, 85 F.3d at 1559, 1561. In *McKinney*, Judge Mahoney based her decision on applicable state law, pointing to the fact that the subject (pre-bankruptcy) mortgage foreclosure sale had vested legal title to the mortgaged property in the foreclosure sale purchaser (the mortgagee) and extinguished the mortgagor's equitable title, leaving the mortgagor (and, therefore, the mortgagor's estate) with only a temporary, statutory right to regain a property right or interest in the foreclosed property (akin to an option). *McKinney*, 174 B.R. at 333-34. Judge Mahoney, therefore, did not regard the post-foreclosure, statutory redemption right (the estate's property) as an interest in the mortgaged property, at least not one that could be construed as encumbered by a lien, and Judge Mahoney did not see fit to characterize the redemptioner's exercise of the redemption right as "curing or waiving" a payment default. *See id.* at 335-36.

Ultimately, whether the Eleventh Circuit placed greater reliance on state law treatment of the post-foreclosure statutory right to redeem realty in Alabama as a temporary right to regain a property interest in the foreclosed realty (as in *McKinney*) or the pragmatic rationales of the Sixth Circuit in *Glenn*, the result is the same. *Smith* means that a mortgagee or other person that takes title to mortgaged realty at a valid foreclosure sale is not subject to treatment as the holder of a claim secured by a lien on the foreclosed property in bankruptcy, and a mortgagor's post-foreclosure, temporal right to redeem the foreclosed real property cannot be extended by a chapter 13 plan. *See Smith*, 85 F.3d at 1561.

26

Conversely, a mortgagor's non-temporal common law equity of redemption in mortgaged real property is a sufficient property interest to subject the mortgagee to treatment as the holder of a lien on, and claim secured by, the mortgaged property in bankruptcy in the Eleventh Circuit. *See Saylors*, 869 F.2d at 1436-37 (explaining that the "Alabama equitable right of redemption is more valuable than the [post-foreclosure] statutory right of redemption"); *see also Morrison*, 747 F.2d at 613-14 (characterizing the equity of redemption right as a property interest transferable by deed and explaining that the statutory right to redeem post-foreclosure is a personal privilege that is generally less valuable than the equity of redemption). In other words, up until the point of foreclosure, a mortgagee is subject to treatment as the holder of a claim secured by a lien on the mortgaged property in the mortgagor's bankruptcy, even in a nominal "title theory" state like Alabama. *See Saylors*, 869 F.2d at 1436-37.

Notably, the equity of redemption (also referred to in Alabama as equitable title) is *the* property right that a mortgagor retains if the mortgage is construed as transferring legal title to the mortgagee, and it is considered an estate in the mortgaged property that is sufficient to regard the mortgagor as the owner of the mortgaged property as against everyone other than the mortgagee. *See Mallory v. Agee*, 147 So. 881, 882 (Ala. 1932) ("After, as before, default, before foreclosure, the mortgagor has an equity of redemption, which is a property right, and, in all controversies, except with the mortgagee, it is treated at law as the legal title, and sufficient to sustain any action which requires the legal title…It is true that some of the cases express it by saying that after default nothing remains in the mortgagor but the equity of redemption. But it is only in controversies between the mortgagor and mortgagee that courts of law do not treat such so called 'equity' as the legal title."); *First Union Nat'l Bank*, 75 So. 3d 105, 113 (Ala. 2011) (concluding that there is no "absolute owner" of property until there is a merger of equitable and legal title and that a mortgagor

27

retains his or her status as "owner and holder of equitable title" until foreclosure) (internal citations omitted). In Alabama, a mortgagor may transfer the mortgagor's equity of redemption to the mortgagee for valuable consideration (*see, e.g.*, Ala. Code § 35-10-51; *Ebersole v. Ala. Home Bldg. & Loan Ass'n*, 96 So. 245, 246 (Ala. 1923)), but not at the loan's inception (i.e., only the mortgagor's legal title, not the mortgagor's equitable title is subject to forfeiture), and any contractual provision in a loan document signed at the loan's inception that purports to forfeit the mortgagor's equity of redemption to the mortgagee is void. *See Parmer v. Parmer*, 74 Ala. 285, 287–88 (1883) ("No principle of equity jurisprudence is more firmly settled, than that the mortgagor's right to redeem can not be waived or extinguished by any collateral agreement entered into contemporaneously with the execution of the mortgage…Where, therefore, a mortgagor is induced to enter into a contract with the mortgagee, *at the time of the loan of the money*, waiving, or agreeing not to exercise, his right of redemption in the event of default, the contract will be set aside, as being oppressive to the debtor, and offensive to the established maxim of equity, 'once a mortgage, always a mortgage'.") (emphasis in original). Further, although the equity of redemption originally was enforceable only in courts of equity, the merger of courts of law and equity largely rendered this distinction meaningless. *See* Ala. R. Civ. P. 2. Foreclosure of a mortgage extinguishes the mortgagor's equity of redemption, merging legal and equitable title to the mortgaged property in the mortgagee or its transferee. *Trauner v. Lowrey*, 369 So. 2d 531, 534 (Ala. 1979). However, until the equity of redemption is extinguished, the mortgagor's (or its transferee's) equitable property interest secures the mortgage, and the mortgagee's (defeasible) legal title is not the equivalent of absolute ownership of the mortgaged property. *See First Union Nat'l Bank*, 75 So. 3d at 113.

Prior to the merger of courts of law and equity, the common law conferred greater protections to chattel mortgagors in possession than it did to chattel mortgagors out of possession—with both courts of law and equity, not merely courts of equity, recognizing the defeasibility of a chattel mortgagee's interest in chattel remaining in the mortgagor's possession. *See, e.g.*, *Hall & Brown Wood Working Mach. Co. v. Haley Furniture & Mfg. Co.*, 56 So. 726, 728 (Ala. 1911) ("[E]ven in a court of law, a tender of the debt by the mortgagor after the law day, if made before seizure of or demand for the chattels, revests the legal title in the mortgagor."); *Maxwell v. Moore*, 95 Ala. 166, 169 (Ala. 1891) ("In a few, the courts hold that an unaccepted tender after default will not, at law, re-invest the mortgagor with the title, and that his only remedy is in equity to redeem; but, in the others, the common-law rule, that after condition broken the title vests absolutely in the mortgagee, has not been applied so strictly, where the mortgage is of personal property, as to hold that a tender after default, when kept good, can not, under any circumstances, operate the destruction of the lien."); *Frank v. Pickens*, 69 Ala. 369, 370-71 (1881) (recognizing that the title of a mortgagee is conditional and defeasible and discussing that a post-default tender made before the mortgagee acquires possession may destroy the title of the mortgagee but that, after the mortgagee has taken possession, only the acceptance of payment operates as a waiver of the breach of the condition and consequent forfeiture of legal title). However, even an Alabama chattel mortgagor out of possession retains the common law equity of redemption until foreclosure. *See Harmon*, 64 So. at 624 (recognizing equity of redemption in mortgaged chattel post-default and repossession); *Frank*, 69 Ala. at 372 (recognizing the right of a chattel mortgagor to claim redemption in a court of equity after default and repossession). A chattel mortgagor's contractual right to possession under a mortgage agreement is an interest in the mortgaged property that is separate and distinct from the mortgagor's equity of redemption.

29

*Horton v. Hovater*, 66 So. 939, 940 (Ala. Ct. App. 1914). Moreover, as in the real property context, a chattel mortgagor's equity of redemption is not subject to forfeiture at the mortgage loan's inception, and the chattel mortgagor's equity of redemption is regarded as a transferable property interest in mortgaged chattel. *Goodman v. Pledger*, 14 Ala. 114, 118 (1848) (enslaved person at issue).[12]

Like the common law of chattel mortgages, the Alabama UCC protects the rights and interests of a debtor in and to collateral for a secured credit transaction in a variety of ways. Specifically, in transactions subject to part six of Alabama Article 9A (like the subject secured credit transaction)[13] a debtor's pre-foreclosure UCC statutory right of redemption—a codification of the equity of redemption, *see* Gilmore § 44.2, at 1216 (characterizing the UCC right of redemption as preserving the equity of redemption); *In re Greene*, 248 B.R. 583, 614 (Bankr. N.D. Ala. 2000) (explaining that the UCC redemption right is the "statutory embodiment in the Uniform Commercial Code of the equity of redemption")—cannot be waived or transferred to a secured party pre-default (and, in a consumer good transaction, cannot be waived by agreement at all). *See* Ala. Code §§ 7-9A-602(11), 7-9A-623, 7-9A-624. A debtor also cannot agree to a lender's acceptance of collateral in full or partial satisfaction of the debt (i.e., strict foreclosure) pre-default when part six applies. *See id.* §§ 7-9A-602(10), 7-9A-620. And, in a transaction subject to part six, a debtor cannot waive the debtor's right to a surplus from a disposition (e.g., foreclosure by sale) pre-default. *See id.* §§ 7-9A-602(5), 7-9A-615(d). Conversely, a secured party's right to recover any deficiency from a debtor is waivable. *See id.* § 7-9A-602 (applying only to certain

---

[12] The abject horror of our legal system's treatment of human beings as ordinary property cannot be overstated; however, the Alabama Supreme Court's statements as to the ordinary rules of chattel mortgage law in *Goodman* do not carry less authority in our legal system by virtue of their repugnant application to persons held in slavery.

[13] Some secured credit transactions that are included within the scope of Alabama Article 9A are not subject to part six of the article, but none of the exclusions are applicable here. *See* Ala. Code § 7-9A-601(g).

Alabama Article 9A sections and only to the extent "they give rights to a debtor or obligor and impose duties on a secured party").  Thus, a secured creditor can, by contract, limit or waive recourse against a debtor personally at a secured credit transaction's inception, but a debtor in a secured credit transaction subject to part six of Alabama Article 9A cannot, by contract, waive the debtor's UCC redemption or surplus rights to collateral pre-default, or (as a matter of state common law) contractually agree to forfeit the debtor's equitable title to the secured party at the secured credit transaction's inception.  As Gilmore explains:

> Since the beginnings of mortgage law, it has never been questioned that the mortgagor's equity is entitled to absolute protection and cannot be frittered away. No agreement, we have long been told, will be allowed to 'clog the equity of redemption.' And not even the most drastic of pledge agreements has ever purported to free the pledgee from his inescapable duties of accounting to the pledgor for the value of the pledged property and of remitting any surplus. Article 9, therefore merely reflects history when it provides that the debtor's rights and the secured party's correlative duties following default 'may not be waived or varied.'

Gilmore, § 44.4, at 1228-29.

Even though the Eleventh Circuit has had little trouble characterizing an Alabama real property mortgagor's equity of redemption as a property interest in the mortgaged realty that is sufficient to subject the mortgagee to treatment as the holder of a claim secured by a lien on the mortgaged property (*see Saylors*, 869 F.2d at 1436-37), the result is less clear when the property is mortgaged chattel in the possession of the mortgagee.  As noted above, the Eleventh Circuit has held that, after default, an Alabama chattel mortgagor lacks a sufficient interest in mortgaged chattel in possession of the mortgagee to compel turnover under Bankruptcy Code section 542(a), because the chattel mortgagee's legal title is considered vested, at law, upon the mortgagor's default if the mortgagee has exercised its right to take possession of the mortgaged chattel.  *See Lewis*, 137 F.3d at 1283-84.  *Lewis* also has been construed as implicitly holding that the vesting, at law, of legal title to mortgaged property in a chattel mortgagee pre-bankruptcy forecloses the

31

debtor/mortgagor from treating the mortgagee in possession as the holder of a claim secured by a lien on the mortgaged property.[14] Whether a chattel mortgagee's pre-bankruptcy repossession forecloses treatment of the mortgagee as the holder of a claim secured by a Bankruptcy Code lien on the mortgaged chattel need not be definitively answered in this proceeding, as *Lewis* (consistent

---

[14] In an alternative adequate protection analysis, the Circuit, in *Lewis*, concluded that the mortgaged chattel was not subject to turnover by the mortgagee because the mortgagee's interest in the mortgaged chattel was not adequately protected by the debtor's plan, which proposed to strip down the mortgagee's secured claim to the value of the mortgaged chattel and not to redeem the mortgaged property in accordance with applicable state law. *Lewis*, 137 F.3d at 1285. It is conceivable, then, that Lewis's alternative adequate protection analysis is premised on an assumption, or perhaps even an implicit holding, that an Alabama mortgagee in possession cannot be regarded as holding a claim secured by a lien on the mortgaged chattel. That said, as discussed herein, a chattel mortgagee in possession, post-default, has a property interest in the mortgaged chattel that is vested at law (legal title), but the vesting of the mortgagee's legal title at law does not extinguish the mortgagor's non-temporal equity of redemption (a property interest in the mortgaged chattel that passes to the mortgagor's bankruptcy estate upon filing). Moreover, under Alabama Article 9A, a chattel mortgagor's debt is not satisfied, in whole or in part, by the vesting of legal title in the mortgagee at law, and the chattel mortgagor's equitable title remains encumbered by the mortgage until foreclosure merges legal and equitable title in the mortgagee or its transferee, free and clear of the secured obligation and junior liens and security interests. *See* Ala. Code §§ 7-9A-615, 7-9A-617, 7-9A-620, 7-9A-622. Additionally, a chattel mortgagor out of possession retains a statutory, non-temporal redemption right under Alabama Article 9A until foreclosure, absent a valid post-default waiver. *See id.* §§ 7-9A-602, 7-9A-619(c), 7-9A-623. Non-temporal redemption rights (be they equitable or statutory) are, themselves, property that may be administered in bankruptcy. *See Wright*, 304 U.S. at 514-15. Section 506 contains no requirement that the estate's encumbered property be "title" (legal, equitable, or absolute), nor does section 506(a) require that an estate's interest be possessory. And, a debtor need not possess or absolutely own collateral to grant a security interest in the debtor's interest(s) in the collateral under Alabama Article 9A. *See* Ala. Code § 7-9A-102 (a)(28) (defining "debtor"); *see also* Gilmore § 45.5, at 1305 ("As the general concept of 'property' broadens, so does the range of things and claims to which a security interest can presently attach."). Thus, the undersigned cannot readily offer a rationale for the Circuit's assumption or implicit holding, in *Lewis*, that a chattel mortgagee in possession pre-foreclosure does not hold a Bankruptcy Code lien on the mortgaged property; in fact, for this court to so hold may conflict with prior binding precedent. *See Wright*, 304 U.S. at 514-15; *Saylors*, 869 F.2d at 1437-39. It is notable that the result, in chapter 13, when section 506(a) is inapplicable (such as to 910-claims), has been to require treatment of the claim holder as fully secured (i.e., to require the debtor to pay the creditor the present value of its allowed claim to discharge the lien), not to require the debtor to pay the secured obligation on contract terms or to redeem in accordance with applicable state law. *See Dean*, 537 F.3d at 1320. Also notable, the result, when section 1322(b)(2) is inapplicable (because the debt is a long-term debt secured only by the debtor's principal residence), is to require the debtor/equity of redemption holder to cure the payment defaults via the plan and to make continuing payments on contract terms (directly to the creditor or via conduit payments by the trustee), not to prevent de-acceleration of the mortgage debt or to require the debtor to redeem in accordance with state law. *See Saylors*, 869 F.2d at 1437-39. No claim will lie for the conversion of real property in Alabama, *see Hatfield v. Spears*, 380 So. 2d 262, 265 (Ala. 1980), which perhaps provides some explanation for the Circuit's seemingly disparate treatment, in bankruptcy, of the state law import of the pre-petition vesting of legal title in a real property mortgage at law (which occurs upon default in Alabama) and the state law import of the pre-petition vesting of legal title in a chattel mortgage at law (which requires that the mortgagee have possession post-default). It is notable, though, that, "[a] claim for conversion is a legal one cognizable at law," *Ballenger v. Liberty Nat'l Life Ins. Co.*, 96 So. 2d 728, 733 (Ala. 1957), whereas the equity of redemption (for a time) was enforceable only in equity. Of course, whether a chattel mortgagee in possession is or is not subject to classification as the holder of a claim secured by a lien on the mortgaged property, the stay enjoins affirmative acts to extinguish, or to secure the voluntary transfer of, the estate's non-temporal redemption rights (*see* 11 U.S.C. §§ 101(54), 362(a), 362(b)(24), 549(a)), leaving the rights to redeem intact and subject to exercise by a debtor or trustee until the secured party obtains relief from stay and forecloses.

32

with Alabama law) implicitly recognizes that a chattel mortgagee's legal title is not indefeasibly vested at law until the mortgagee takes possession of the mortgaged property (which has not yet occurred here) and *Lewis* explicitly acknowledges that a chattel mortgagor in possession's rights and interests in mortgaged chattel are the functional equivalent of ownership under Alabama law if the mortgagor holds a non-temporal redemption right. *See Lewis*, 137 F.3d at 1283-84. In other words, even assuming an Alabama debtor/mortgagor must have *both* a non-temporal right to redeem mortgaged chattel *and* possession of the mortgaged chattel (i.e., the mortgagee's legal title must be defeasible at law and in equity) in order to treat the chattel mortgagee as the holder of a claim secured by a Bankruptcy Code lien on the mortgaged property, such was the case on Hambright's petition date. Chattel mortgagees out of possession have long been treated as secured claim holders in bankruptcy in Alabama, without (to this court's knowledge) any challenge. Therefore, unless the forfeiture perfected TitleMax's Bankruptcy Code lien on the Vehicle to absolute title to the Vehicle, Hambright's Bankruptcy Code rights to treat TitleMax as the holder of a modifiable secured claim, under sections 506(a), 1322(b), and 1325(a)(5), are not interrupted by the state law forfeiture.

It bears mention that not all personal property security devices are subject to characterization as common law chattel mortgages. Another pre-UCC security device—the pledge—conveys only a lien under Alabama common law, not legal title (i.e., pre-merger of the courts of law and equity, both courts recognized a pledgor's right to redeem until foreclosure). *See Oden v. Vaughn*, 85 So. 779, 782 (Ala. 1920) ("A pledge differs from a chattel mortgage in three essential characteristics: (1) It may be constituted without any contract in writing, merely by delivery of the thing pledged. (2) It is constituted by a delivery of the thing pledged, and is continued only so long as the possession remains with the creditor. (3) It does not generally pass

33

the title to the thing pledged, but gives only a lien to the creditor, while the debtor retains the general property."); *Keeble v. Jones*, 65 So. 384, 388 (Ala. 1914) ("[T]he pledgor holds a position of better advantage than that of a mortgagor. After forfeiture, the mortgagee has the complete legal title, and his possession, without recognition of the mortgagor's equity, is referred to his legal title, and is adverse to the mortgagor…In the case of pledge, such as here, the general title remains in the pledgor, there is no forfeiture until the property is applied as security to the payment of the debt secured, and the pledgee is presumed, until the contrary appears, to hold in subordination to the pledgor's title."); *see also* Gilmore § 1.1, at 6 ("The distinction between mortgage and pledge was of considerable importance in determining the rights of the parties to the security transaction or of third parties affected by it. The pledgor's right to redeem the collateral from the pledge after default and before foreclosure was firmly established at law at a time when the mortgagor's comparable right was available only in equity."); *see id.* at 9 ("The unification of law and equity made irrelevant some of the issues which had turned on the pledge-mortgage distinction; the progressively harsher attitude of the Bankruptcy Act toward late perfected security interests of all kinds disposed of others."). Although the word "pledge" is sometimes used to refer generally to the giving of something as security for a debt—and there may be species of non-possessory, personal property security devices that are referred to as pledges—the common law security device of pledge depends on the secured party's possession of the pledged good. *See Oden*, 85 So. at 782. As Gilmore explains, "any arrangement under which the debtor had the right to retain the collateral until default could not be a pledge." Gilmore § 1.1, at 5. Gilmore goes on to state:

> Possession is a simple concept. The pledgee can hold the property himself or through an agent. The agent cannot, however, be either the debtor-pledgor or anyone under his control, since the basic pledge idea is that the pledgor must not be able to pass the goods off as his own.

*Id.* § 14.2, at 440.

34

As under the common law, Alabama Article 9A generally does not require that a debtor sign a written security agreement for a secured party to acquire or perfect a security interest in goods or quasi-intangibles in the possession of the secured party (i.e., a writing generally is not required for a secured party to obtain an attached, perfected security interest in pledgeable property). *See* Ala. Code § 7-9A-203(b)(3). However, under the Alabama UCC, a secured party cannot be regarded as having possession of collateral in the hands of the debtor for attachment, perfection, or enforcement purposes (and, with limited exceptions, even a secured party's possession of a vehicle covered by a certificate of title is insufficient to perfect a security interest in the vehicle). *See id.* § 7-9A-205(a)(1)(A), (b) (stating a security interest "is not invalid or fraudulent against creditors solely because…the debtor has the right or ability to use…or dispose of all or part of the collateral" but that "[t]his section does not relax the requirements of possession if attachment, perfection, or enforcement of a security interest depends upon possession of the collateral by the secured party"); *see also id.* § 7-9A-313; *State v. Pressley*, 100 So. 3d 1058, 1067 (Ala. Civ. App. 2012) ("[T]o the extent that there may exist a 'possession' exception to the writing requirement of § 7-9A-203, possession must be in the secured party, not the debtor."). Significantly, courts have long been hostile to theories of constructive possession that rely on a debtor's possession of collateral as agent for its secured lender, and it is against this backdrop that the UCC was drafted and adopted in Alabama. *See* Gilmore § 14.2, at 440 ("A number of old cases show experimentation with the idea of making the pledgor agent for the pledgee—as, for example, by having the pledgor issue warehouse receipts for goods in his factory or storehouse—but at this point the courts held the line; it has been frozen law for fifty years that the possession which perfects a pledge is that of the pledgee himself or of some third party who is independent of the pledgor."); *see also* Ala. Code § 7-9A-313, off. cmt. 3 ("The debtor cannot qualify as an

agent for the secured party for purposes of the secured party's taking possession.").  In UCC terminology, the categories of property in which a security interest is perfected by the secured party's (or its non-debtor agent's) possession of the property (i.e., collateral that is pledgeable) are goods (other than, with limited exceptions, goods covered by a certificate of title, *see id.* §§ 7-9A-313(b), 7-9A-316(d)), instruments, money, tangible negotiable documents, and tangible chattel paper.  *See generally id.* §§ 7-9A-312(c), 7-9A-313(a), (b); Gilmore § 14.1, at 439.  Otherwise, unless the secured party's security interest is, by statute, perfected upon attachment (*see* Ala. Code § 7-9A-309), a public filing by the secured party or some other action is required to perfect the secured party's Article 9 security interest.  *See id.* §§ 7-9A-310, 7-9A-312, 7-9A-314.

Although the common law of chattel mortgages applies only to certain written security agreements covering tangible personalty (not oral security agreements sufficient to support attachment and perfection by possession, e.g., common law pledges), a written security agreement need not be styled a "mortgage" for the Alabama common law of chattel mortgages to apply.  Prior to widespread adoption of the UCC, courts constantly were tasked with evaluating the validity of new security devices.  *See* Gilmore § 2.6, at 50-51.  "[I]n dealing with this problem the courts seem to have assumed instinctively that the chattel mortgage was the basic or primordial device with respect to all personal property security transactions. If the security holder took possession of the collateral, the transaction of course might be described either as a pledge or a mortgage…If the borrower remained in possession, the only thing the transaction could be, to start with, was a chattel mortgage." *See id.* at 51.  Notably, even a debtor's purported sale of personalty pursuant to a signed bill of sale is subject to characterization as a chattel mortgage under Alabama common law if the facts evidence that the parties intended a secured credit transaction and not a true sale—such as by virtue of the debtor's contractual retention of a right to repurchase for the amount of the "purchase

36

price," plus interest. *See Rice v. Garnett*, 84 So. 557, 558 (Ala. Ct. App. 1919), *cert. denied*, 204 Ala. 698 (1920) (holding that a $20.00 loan secured by the borrower's delivery of a diamond ring to the lender and a writing purporting to sell the ring to the lender for $23.50, subject to a 30-day repurchase right, was subject to characterization as a chattel mortgage).

The UCC did not do away with pre-Code security devices, but it eliminated many of the technical distinctions between them. The Alabama UCC applies to all personal property security devices that are not subject to an exclusion provision, extending the redemption right(s) afforded at common law to debtors in "weak title" devices (like chattel mortgages) and "lien" devices (like pledges) to debtors in "strong title" devices (like conditional sales). *See, e.g.*, Ala. Code §§ 7-9A-109, 7-9A-623; *see also* Gilmore § 3.2, at 67 (explaining that, at common law, title retention devices were looked on as "somehow 'stronger' than the 'weaker' lien devices of mortgage, pledge…"). In fact, under the Alabama UCC (as under the UCC), even a seller's purported retention of title in a purchase money transaction (i.e., a conditional sale) is effective to reserve only a security interest, which, by definition and legal effect, is something less than absolute title. *See* Ala. Code § 7-1-201(b)(35) (defining "security interest").

Because chattel mortgages convey legal title, not merely a lien, a purported purchaser of goods subject to a repurchase right pursuant to a written conveyance, like a bill of sale, can acquire legal title to the good that is vested, at law, upon default *if* the secured party has possession of the subject property (although the secured party's legal title would remain vulnerable to subsequently created interests of the debtor if the secured party's possession of the good is insufficient to perfect an Article 9A security interest). However, if the secured party in a secured credit transaction nominally called a "sale" permits the debtor to retain possession of the purportedly purchased good, the secured party's legal title remains defeasible, at law, upon default, like that of any other

37

chattel mortgagee out of possession. Further, in all chattel mortgage transactions, the debtor/mortgagor (or a subsequent transferee of the debtor/mortgagor) retains the equity of redemption until foreclosure (i.e., absent a voluntary, enforceable transfer of the equity of redemption by the mortgagor, the mortgagor holds equitable title to the mortgaged property, and the mortgagee's legal title is defeasible in equity).

This court sees no reason to conclude that Alabama's common law treatment of the equity of redemption as a transferable property interest in mortgaged chattel has been displaced by the UCC. *See generally id.* § 7-1-103(b) (providing that "[u]nless displaced by the particular provisions of this title, the principles of law and equity…supplement [the] provisions" of the Alabama UCC); *see also id.* § 7-9A-623. Under part six of Alabama Article 9A, and absent a voluntary post-default transfer by the debtor, it is only upon foreclosure (by disposition or acceptance) that a debtor's rights in collateral are transferred to the debtor's secured party or its transferee and the foreclosing party's security interest discharged. *See id.* §§ 7-9A-617(a), 7-9A-622(a). Notably, Alabama Article 9A amended Old Alabama Article 9 to exclude holders of security interests or other liens from the definition of debtor. *Compare id.* § 7-9A-102(a)(28) (stating that "debtor" means "a person having an interest, other than a security interest or other lien, in the collateral") *with id.* § 7-9-105(1)(d), *repealed by* Act 2001-481, p. 647 §1 (eff. Jan. 1, 2002) (stating that "[w]here the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral in any provision of this article dealing with the collateral"); *see* Ala. Code § 7-9A-617; *id.* § 7-9A-102, off. cmt. 2(a) (stating "[s]ecured parties and other lienholders are excluded from the definition of 'debtor' because the interests of those parties normally derive from and encumber a debtor's interest"). As such, if there was a question, under Old Alabama Article 9, as to whether legal title to mortgaged chattel that is vested at law

(by virtue of the mortgagor's default, and the mortgagee's possession) is or is not synonymous with "absolute" title to the collateral, the amendments to Old Alabama Article 9 codified by Alabama Article 9A indicate that legal title and absolute title are not one and the same. *See id.*; *see also id.* § 7-9A-619(c) ("A transfer of the record or legal title to collateral to a secured party under subsection (b) or otherwise is not of itself a disposition of collateral under this article and does not of itself relieve the secured party of its duties under this article.").[15]  This is consistent with the Alabama common law treatment of mortgages.  *See First Union Nat'l Bank*, 75 So. 3d at 113.

This is not to say that a debtor's equity of redemption is not still regarded as "bare" under Alabama law, post-default, if the mortgagee is in possession of the mortgaged personalty—i.e., the debtor has no cognizable conversion claim for a secured party's post-default repossession.  *See Wells v. Cent. Bank, N.*A., 347 So. 2d 114, 120 (Ala. Civ. App. 1977) (explaining, however, that a "debtor is not completely divested of all right and interest in the auto by default, neither is the creditor vested with full power to do with the auto as wished").  Therefore, a debtor's non-temporal redemption right (be it equitable or statutory) may still be an insufficient property interest under Alabama Article 9A to compel a mortgagee's turnover of mortgaged property to a bankruptcy trustee or debtor absent a proposal to pay the debt in full.  *See Lewis*, 137 F.3d at 1283-84 (construing Old Alabama Article 9).  However, *Lewis* does not prohibit the sale of an estate's equity

---

[15] Under the Alabama UCC, record title to a vehicle is held by the person listed as the vehicle's owner on the vehicle's certificate of title.  *See* Ala. Code § 7-9A-619(b).  Record title may be transferred via a UCC transfer statement before legal or equitable title vests in the secured party, or its transferee, and before the secured party's security interest is foreclosed, but a transfer of record title, pre-foreclosure, does not effect an absolute title transfer.  *See id.* §§ 7-9A-619(b), 7-9A-619(c).  Under the Alabama Certificate of Title Act, the interest of the owner must be terminated or the vehicle sold under a security agreement by a lienholder named on the certificate for the transfer of record title to transfer ownership.  *See id.* § 32-8-46(b) (requiring that a lienholder's application for a new certificate of title recording it, or its transferee, as record owner be accompanied by an affidavit made by or on behalf of the lienholder that the vehicle was repossessed *and* that the interest of the owner was lawfully terminated or sold pursuant to the terms of the security agreement); *see also id.* § 32-8-2(6), (7), (12), (18), (19) (broadly defining lien as any interest short of absolute title, including interests conveyed by transactions that take the form of a sale subject to defeasance, a chattel mortgage, or a conditional sale, and defining owner as "a person, other than a lienholder, having the property in or title to a vehicle.").

39

of redemption in mortgaged chattel under 11 U.S.C. § 363 merely because the estate's representative lacks possession of the mortgaged property, nor does *Lewis* stand for the proposition that a secured party may take affirmative action to foreclose an estate's equity of redemption in mortgaged chattel, post-petition, without first obtaining relief from the automatic stay of 11 U.S.C. § 362. Further, as noted herein, a question exists as to whether an estate's equity of redemption, though bare, is, nevertheless, a sufficient property interest to subject a mortgagee in possession to treatment as the holder of a claim secured by a lien on the mortgaged property in bankruptcy. And, in any case, when a debtor has both possession of the mortgaged property (leaving the mortgagee's legal title defeasible at law and in equity) and a non-temporal redemption right on the bankruptcy petition date, as was the case on Hambright's bankruptcy petition date, the debtor/mortgagor's rights and interests in the mortgaged chattel are regarded as the functional equivalent of ownership under Alabama law, subjecting the chattel mortgagee to treatment as a lienholder and secured claimholder to the extent of the mortgaged property's value under Bankruptcy Code section 506(a), at least for so long as the creditor remains a lienholder.

For the foregoing reasons, TitleMax cannot point to its UCC security interest in the Vehicle (or its possible status as a chattel mortgagee under Alabama common law) as the source of its alleged absolute title to the Vehicle because, under the Alabama UCC and common law of chattel mortgages, the legal title or lien granted to TitleMax by the Agreement remains *both* defeasible at law and in equity. In other words, on the petition date, state law regarded Hambright as the owner of the Vehicle (as against everyone other than TitleMax). Moreover, federal bankruptcy law regarded TitleMax as a lienholder, because Hambright had both an equitable (non-temporal) redemption right and a statutory (non-temporal) redemption right, possession of the Vehicle, a contractual right to possession of the Vehicle, and record title to the Vehicle (all subject to

TitleMax's attached, perfected security interest). Under the Alabama UCC and Alabama common law (and absent a valid, authenticated post-default agreement), affirmative conduct (e.g., repossession and/or foreclosure) is required to indefeasibly vest legal title in (or transfer legal title to) TitleMax at law, to merge TitleMax's legal title with the Estate's equitable title, and to extinguish the Estate's UCC redemption and surplus rights, acts which the Bankruptcy Code enjoins.[16] Additionally, Hambright must get court approval to voluntarily convey the Estate's rights to and property interest in the Vehicle to TitleMax or to agree to a strict foreclosure of the Vehicle (at least for so long as those rights and interest remain property of the Estate). As such, TitleMax looks to its rights as a pawnbroker under the Alabama Pawnshop Act to establish that legal and equitable title to the Vehicle indefeasibly vested in TitleMax post-petition.

iv.   <u>Pawn Transactions Generally</u>

A pawn is a personal property security device. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (pawn is defined as "1. [A]n item of personal property deposited as security for a debt; a pledge or guarantee…In modern usage, the term is usually restricted to the pledge of jewels and other personal chattels to pawnbrokers as security for a small loan. 2. The act of depositing personal property in this manner. 3. The condition of being held on deposit as a pledge."). In a pawn transaction, an item of personal property is deposited with a pawnbroker as security for a debt. *See id*. (defining "pledge" and explaining "[T]he pledge is as old as recorded history and is still in use, as the presence of pawnbrokers attests. In this transaction the debtor borrows money by physically transferring to a secured party the possession of the property to be used as security, and the property will be returned if the debt is repaid. Since the debtor does not retain the use of

---

[16] TitleMax's interest in the Vehicle also remains subject to loss by inaction under the Alabama Certificate of Title Act because it has not yet transferred record title to itself or a transferee. *See* Ala. Code § 32-8-64.1.

pledged goods, this security device has obvious disadvantages from the debtor's point of view.") (internal citations omitted).

A transaction is subject to classification as a pawn transaction under the Alabama Pawnshop Act if it is a "loan on the security of pledged goods" (subject to a redemption right), or a "purchase of pledged goods" (subject to a repurchase right), by a licensed pawnbroker; however, whether denominated a loan or a sale (and, by and large, a sale of tangible personalty subject to a repurchase right is regarded as a chattel mortgage, not a true sale),[17] the pledged good must be "left with" the pawnbroker at the transaction's inception for the transaction to come within the Act's definition of pawn transaction. *See* Ala. Code § 5-19A-2(3) (defining pawn transaction as "[a]ny loan on the security of pledged goods or any purchase of pledged goods *on condition that the pledged goods are left with the pawnbroker* and may be redeemed or repurchased by the seller for a fixed price within a fixed period of time" and excluding from the definition of pawn transaction "the pledge to, or the purchase by, a pawnbroker of real or personal property from a customer followed by the sale or the leasing of that property back to the customer in the same or a related transaction.") (emphasis added). In other words, although a chattel mortgage (unlike a pledge) transfers conditional and defeasible legal title to the mortgaged property to the chattel mortgagee (not merely a lien) in a nominal title-theory state like Alabama, and while a chattel mortgage may be possessory or non-possessory in Alabama, only *possessory* chattel mortgages are categorically included in the Alabama Pawnshop Act's definition of pawn transaction. To conclude otherwise would render meaningless the Alabama Pawnshop Act's requirement that a

---

[17] As discussed herein, a sale of personalty subject to a repurchase right typically is regarded, under Alabama common law, as a secured credit transaction, not a true sale, and the UCC likewise puts substance over form. Gilmore writes that bills of sale often were used in chattel mortgage transactions to "avoid some of the burdens and limitations of mortgage law[,]" albeit with little success—"'the bill of sale mortgagee' found himself subject both to the mortgagor's right to redeem the property and to the right of creditors and purchasers to avoid the mortgage on the ground that it had not been properly recorded." Gilmore § 2.6, at 49-50. *See also Gibson v. Warden*, 81 U.S. 244, 247 (1871) ("A 'chattel mortgage' is only a bill of sale with a defeasance incorporated in it.").

Case 20-70016-JHH    Doc 57    Filed 02/04/22    Entered 02/04/22 16:35:13    Desc Main
Document      Page 42 of 85

pledged good purchased by a pawnbroker subject to a repurchase right, or securing a loan by the pawnbroker, be left by the pawnor with the pawnbroker at the transaction's inception.

Notably, the Alabama Pawnshop Act does not prohibit a pawnbroker from acquiring a non-possessory security interest in other collateral to secure a pawn transaction—only recourse against the debtor personally is proscribed (*see* Ala. Code § 5-19A-8)—but, by definition, the pledged good(s) subject to forfeiture in a pawn transaction (and subject to the Alabama Pawnshop Act's statutory lien) are the item(s) of tangible personal property left with the pawnbroker by the pawnor at the pawn's inception. *See id.* § 5-19A-2(6) (defining "pledged goods" as "[t]angible personal property other than choses in action, securities, or printed evidences of indebtedness, which property is purchased by, deposited with, or otherwise actually delivered into the possession of, a pawnbroker in connection with a pawn transaction"); *see also* Ala. Code §§ 5-19A-10, 5-19A-6.

As with all other pre-UCC personal property security devices, pawns do not escape UCC Article 9 absent a statutory exclusion. *See id.* § 7-9A-109(a) ("Except as otherwise provided in subsections (c) and (d), [18] this article applies to: (1) a transaction, regardless of its form, that creates a security interest in personal property"); Gilmore § 10.1, at 295-97; *see also* AP Doc. 13, Ex. A at 4, ¶¶ 1, 3 (granting TitleMax security interests in the Vehicle and the Vehicle's certificate of title). In Alabama, pawns are not categorically excluded from Alabama Article 9A. *See* Ala. Code § 7-9A-109; *see also Harkness v. EZ Pawn Ala., Inc*., 724 So. 2d 32, 33 (Ala. Civ. App. 1998) ("Undoubtedly, 'pawn transactions in which a debtor consensually grants a pawnbroker a security interest in goods…are secured transactions under Ala. Code § 7-9-101 *et seq*.'") (quoting *In re Mattheiss*, 214 B.R. 20, 28 (Bankr. N.D. Ala. 1997) (Stilson, J.)). Moreover, the Alabama

---

[18] None of the statutory exclusions apply to the security interests granted by the Agreement. *See* Ala. Code § 7-9A-109(c), (d).

43

Pawnshop Act does not repeal or replace any provision of the Alabama UCC. *See* Ala. Code § 5-19A-20 ("This chapter shall not repeal or be construed to repeal any provision of the Uniform Commercial Code, Sections 7-1-101 *et seq*."). However, the Alabama Pawnshop Act will control in the event of an actual conflict. *See id.* § 7-9A-201 (b), (c).

One conflict derives from the Alabama Pawnshop Act's statutory forfeiture provision. *See generally id.* § 5-19A-6. As noted above, both the Alabama common law and the Alabama UCC void contractual provisions signed at the inception of a loan that purport to forfeit a debtor's equitable title or UCC redemption and surplus rights in or to a good to a secured party, meaning affirmative enforcement action by a secured party or a voluntary (post-default) transfer by a debtor is required to indefeasibly vest both legal and equitable in a secured party under the Alabama common law and Alabama UCC. The Alabama Pawnshop Act's forfeiture provision directly conflicts, as it automatically transfers all right, title, and interest of a pawnor in pledged good(s), at law and in equity, to the pawnbroker, if the pawnor fails to redeem (i.e., to regain possession of the pledged good by payment of the agreed sum) within 30 days after the pawn transaction's maturity. *See id.* ("A pledgor shall have no obligation to redeem pledged goods or make any payment on a pawn transaction. Pledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker."). In other words, forfeiture effects an involuntary transfer of all of the pawnor's rights in the pledged good (including any right to profits realized by the pawnbroker upon disposition), without the necessity of any affirmative enforcement action by the pawnbroker.

Dating back to the 1896 Code of Alabama until the Alabama Pawnshop Act took effect in 1992, Alabama's pawn statutes required pawnbrokers to sell pledged items by advertised public

44

auction; no pledge could be sold until 60 days after the date when the pledge was delivered to the pawnbroker; and, until sale, the pawnor had the right to redeem. *Id.* §§ 8-1-81 to 8-1-83 (1975), *repealed by* Acts 1992, No. 92-597 (eff. May 21, 1992); *id.* §§ 9-2-17 to 9-2-19 (1940, recompiled 1958); *id.* ch. 329 §§ 9411 to 9413 (1923); *id.* ch. 123 §§ 5293 to 5295 (1907); *id*. ch. 88 §§ 3245 to 3247 (1896). Thus, the codification of the Alabama Pawnshop Act in 1992 marked a departure from prior pawnshop laws (and the common law) as pertains to a pawnor's right to redeem pledged property from a licensed pawnbroker. In effect, forfeiture effects a pre-agreed strict foreclosure of the pawnor's interest(s) in the pledged good(s). *See In re Schwalb*, 347 B.R. 726, 736 (Bankr. D. Nev. 2006).[19]

"Both strict foreclosure and the common law conditional sale rule work very well when the value of the collateral and the amount of the secured obligation (plus the predictable expenses of foreclosure) are roughly equivalents." Gilmore § 44.3, at 1220-21. However, both the Alabama common law and Alabama UCC evolved to recognize that, in all secured credit transactions (excepting consignments and sales of accounts, chattel paper, payment intangibles, or promissory notes, *see* Ala. Code § 7-9A-601(g)), "[w]hen…the value of the collateral exceeds the amount of the secured obligation…the debtor has an equity which should be preserved, either for the debtor himself or, if he is insolvent, for his other creditors." Gilmore § 44.3, at 1221. Notably, lower loan to value ratios are characteristic of most pawn transactions. *See generally* Jim Hawkins, REGULATING ON THE FRINGE: REEXAMINING THE LINK BETWEEN FRINGE BANKING AND FINANCIAL

---

[19] [A] separate question is whether intervening liens and interests that attach to pledged good(s) pre-forfeiture are extinguished by forfeiture. The Alabama Pawnshop Act subordinates a pawnbroker's statutory, possessory lien on pledged goods to "the rights of other persons who have an ownership interest or prior liens in the pledged goods," but does not speak, directly to junior liens or interests. *See* Ala. Code § 5-19A-10. Although the forfeiture provision is broadly worded (*see id.* § 5-19A-6), forfeiture has not been construed as extinguishing interest(s) in pawned goods acquired subsequent to the pawn but prior to the pawnor's forfeiture of the pledged good(s) to the pawnbroker. *See State ex rel. Morgan v. Thompson*, 791 So. 2d 977, 979 (Ala. Civ. App. 2001) (plurality opinion) (holding seizure of pawned property, prior to expiration of the pawnor's temporal redemption period, foreclosed characterization of the pawnbroker as the property's owner in the criminal forfeiture proceeding).

45

DISTRESS, 86 Ind. L.J. 1361, 1389-93 (2011). Thus, unlike the common law rationales for permitting strict foreclosure and allowing forfeiture in conditional sales transactions, forfeiture in pawn transactions often is justified by the assertion that the value of most pawned goods is small, and that a pawnor, in choosing not to repay a loan, is electing to self-liquidate an item of personalty that may have significant personal value but is not a valuable asset of the pawnor. *Id.*

Ultimately, this is all to say that, while pawns in Alabama are secured credit transactions governed by Alabama Article 9A, meaning forfeiture cannot be accomplished by agreement pre-default, the Alabama Pawnshop Act *can* effect a post-default forfeiture of collateral to a pawnbroker by operation of law, even absent a post-default agreement. Importantly, though, forfeiture is the exception, not the rule, under Alabama Article 9A, and, therefore, whether an item of collateral is subject to forfeiture to a pawnbroker depends on whether the collateral is (or is not) a pledged good within the meaning of the Alabama Pawnshop Act. If collateral for a pawn transaction is not a pledged good, it is not subject to forfeiture under the Alabama Pawnshop Act, and the Alabama UCC and Alabama common law control the parties' respective rights and obligations in the collateral (not the Alabama Pawnshop Act's forfeiture provision).

v.  Forfeiture of Pledged Goods in Bankruptcy

In 2005, Congress amended the Bankruptcy Code to exclude, with certain exceptions, a debtor's property interest(s) in pledged goods from the debtor's estate if the debtor or trustee fails to timely regain possession by payment of the secured obligation. Specifically, Congress enacted section 541(b)(8) as part of the Bankruptcy Abuse Prevention and Consumer Protection Act, which excludes from a bankruptcy estate the following interests in property:

> subject to subchapter III of chapter 5, any interest of the debtor in property where
> the debtor pledged or sold tangible personal property (other than securities or
> written or printed evidences of indebtedness or title) as collateral for a loan or

46

advance of money given by a person licensed under law to make such loans or advances, where—

(A) the tangible personal property is in the possession of the pledgee or transferee;

(B) the debtor has no obligation to repay the money, redeem the collateral, or buy back the property at a stipulated price; and

(C) neither the debtor nor the trustee have exercised any right to redeem provided under contract or State law, in a timely manner as provided under State law and section 108(b)[.]

11 U.S.C. § 541(b)(8). As only post-petition transfers of *estate* property are avoidable under Bankruptcy Code section 549, the exclusion of a pawned item from a bankruptcy estate at the delineated point of default presumably renders section 549 inapplicable to any resulting forfeiture of the debtor's property interest(s) to the secured party (though stay relief may still be necessary if affirmative conduct by the secured party is necessary for the secured party to acquire or extinguish a debtor's rights or interests in a good). *See id*. § 549(a); *see also In re Sorensen*, 586 B.R. 327, 334-36 (B.A.P. 9th Cir. 2018); *Cash Am. Advance, Inc. v. Prado*, 413 B.R. 599, 604-08 (S.D. Tex. 2008); 5 COLLIER ON BANKRUPTCY ¶ 541.24.

In a chapter 13 case, a trustee generally will not have the right to use estate property to redeem a pawned good. *See generally* 11 U.S.C. § 363(b), (d), (e), (f), (l); *see also id*. § 1303. Thus, it falls to the chapter 13 debtor to redeem (though bankruptcy court approval may be needed if estate property is to be used to fund a redemption). Although section 108(b) speaks only to the rights of a trustee (not a debtor) (*compare id.* § 108(b) *with id*. § 1322(b)(3)), and is not made applicable to debtors by Bankruptcy Code section 1303 (*see In re Cumbess*, 960 F.3d 1325, 1334 (11th Cir. 2020) (discussing Congress's appreciation of "the important distinction between the 'trustee' and the 'debtor'" in section 1303)), it is expressly applicable to a debtor's timeframe to redeem property covered by 541(b)(8)'s exclusion from the estate (*see* 11 U.S.C. § 541(b)(8)(C)),

47

presumably foreclosing a debtor invoking section 1322(b)(3) to cure or waive a payment default that triggers forfeiture. *See generally* W. Homer Drake, Jr., Paul W. Bonapfel, & Adam M. Goodman, CHAPTER 13 PRACTICE & PROCEDURE § 14:16 (2021 ed.) ("Exclusion of 'pawned' property from property of the estate—§ 541(b)(8)").

Although pawns are treated differently than other secured credit transactions (both in and outside of bankruptcy), it is important to note that, in Alabama at least, forfeiture is the mode by which the pawnbroker acquires indefeasibly vested legal and equitable title to a pledged good. Until forfeiture occurs, the pawnbroker holds no more than a security interest (subject to characterization as a lien, if the transaction is a mere pledge, or as conditional and defeasible legal title, if the transaction is a chattel mortgage), apart from the pawnbroker's statutory lien on the pledged good(s) under the Alabama Pawnshop Act. *See, e.g.*, *Morgan v. Thompson*, 791 So. 2d at 978-79. Thus, forfeiture, in most, if not all, Alabama pawn transactions, effects a transfer (as defined by the Bankruptcy Code)—as forfeiture is the mode by which the pawnor (or the pawnor's estate, if forfeiture occurs post-petition) is divested of the pawnor's UCC surplus and redemption rights in the pledged good(s) and by which the pawnor's property interest(s) in the pledged good(s) (i.e., legal and/or equitable title) pass to the pawnbroker. When section 541(b)(8) is inapplicable— and the Eleventh Circuit has concluded that title loans are excepted from this exclusion provision (*see Northington*, 876 F.3d at 1314, n.9)—the statutory exclusion provides no Bankruptcy Code safe harbor for a post-petition transfer of estate property effected by a state law forfeiture provision. This is not to say that such a transfer is not authorized by the Bankruptcy Code—it simply is not authorized by Bankruptcy Code section 541(b)(8)—nor is it to say that inapplicability of Bankruptcy Code section 541(b)(8) to a particular pawn transaction is determinative of the pawnbroker's status in bankruptcy.

In *Northington*, for instance, the Eleventh Circuit held that the chapter 13 debtor was not entitled to treat the Georgia pawnbroker as a secured creditor—notwithstanding the inapplicability of Bankruptcy Code section 541(b)(8)—because, on the petition date, the debtor held only a temporal right to *regain* title to, and possession of, the pawned property (not legal or equitable title or a present right of possession). 876 F.3d at 1306 (describing the debtor's right to "regain title" to the car by timely paying the secured obligation); *id*. at 1306, n.2 (noting the pawnbroker's statutory right to take possession during the redemption period); *id*. at 1309-10 (characterizing the interests that entered the estate as a "right to possess" and a "right to redeem"). Holding that the automatic stay did not indefinitely toll the natural expiration of the debtor's temporal right to retain possession and redeem beyond the timeframes established by 108(b), and likening the debtor's right to redeem the pawned good to an option, expiration of the right (pre-confirmation) was held to foreclose treatment of the pawnbroker as a lienholder in the debtor's chapter 13 plan. *Id.* at 1313-15. It bears mention that, in *Northington*, forfeiture was not expressly treated as divesting the debtor (or the debtor's estate) of any property interest in the vehicle, as the Circuit concluded or assumed that no legal or equitable property interest in the pawned vehicle entered the estate.[20] The estate's only identified "property" was the temporary right to re-acquire title to the vehicle, which right met its natural (albeit extended) expiration post-petition, and a bare possessory interest. *Northington's* conclusion, in reliance on the canon against negative implication, that the debtor's temporal redemption right was not frozen in the estate by virtue of section 541(b)(8)'s exception of title pledges from the provision's exclusion (*see id.* at 1314 n.9), does not mean the Circuit viewed the exceptions to section 541(b)(8)'s exclusion as of no import in bankruptcy. An equally important tenant of statutory construction, the canon against surplusage (*see* Klee & Holt, at 18

---

[20] The Circuit also did not expressly address the impact of forfeiture of a pledgor's interests in pledged goods under the Georgia pawn statutes on a bankruptcy trustee's hypothetical judgment lien.

49

n.92 (collecting cases)), dictates that courts should not treat the exceptions to the statutory exclusion as meaningless if such interpretation can be avoided.

As discussed above, in Alabama at least, it is only upon forfeiture that legal and equitable title to pledged goods merge and vest in a pawnbroker by operation of state law. The court finds no legal authority to support the conclusion that an Alabama pawnbroker acquires indefeasibly vested legal or equitable title to pledged goods prior to forfeiture of the goods. However, before the court considers the implications of a post-petition forfeiture that divests a bankruptcy estate of a property interest—as distinguished from the post-petition expiration of a statutory right to regain such a property interest—the court must first consider what was forfeited in this proceeding and the consequences of forfeiture as a matter of state law.

vi.   <u>Title Loans in Alabama</u>

The Loan is referred to as a title loan because Hambright pledged the Vehicle's certificate of title to secure the Loan, but retained possession of the Vehicle. Typically, title loans are short term, non-purchase money, non-possessory loans. Perhaps because they are non-possessory secured credit transactions (and greater reliance is placed on collateralization than credit worthiness), loan to value ratios in title loan transactions often are very low. *See* Lynn Drysdale & Kathleen E. Keest, THE TWO-TIERED CONSUMER FINANCIAL SERVICES MARKETPLACE: THE FRINGE BANKING SYSTEM AND ITS CHALLENGE TO CURRENT THINKING ABOUT THE ROLE OF USURY LAWS IN TODAY'S SOCIETY, 51 S.C. L. Rev. 589, 597–600 (2000).

It is difficult to conceptualize a vehicle certificate of title pledge in exchange for a loan as anything other than a personal property security device, and, as noted above, personal property security devices do not escape Article 9 of the UCC, absent legislative action. *See* UCC § 9-109; *see also* Gilmore § 10.1, at 297 ("If in the future new needs do require something in the nature of

50

a new 'device,' the need will have to be met by legislative action. [Article 9] forecloses solution by judicial improvisation."). However, title loans appear to be a relatively modern (post-UCC) security device, and states have taken varying approaches to their treatment. Some states have specifically addressed title loans by statute,[21] while others have left it to the courts and governmental agencies and officials to determine which statutes govern title loans and to what extent.[22] Even within these two broad groups, there is tremendous variation in how title loans are treated.

---

[21] *See, e.g.*, Alaska Stat. Ann. § 08.76.590 (excluding "title to property" from the definition of "personal property" that may be pledged to a pawnbroker); Conn. Gen. Stat. Ann. § 21-39 (excepting loans on intangible property including "written or printed evidence of ownership of property" from chapter 409 of title 21 governing pawnbrokers and pawn transactions); Del. Code Ann. tit. 5, §§ 2250 *et seq.* (regulating title loans); Fla. Stat. Ann. § 539.001 (excluding certificates of title from the pawn statute's definition of "pledged goods"); Fla. Stat. Ann. § 537.001 *et seq.* (regulating title loans); Ga. Code Ann. § 44-12-130 (treating certificate of title pledges as vehicle pawns); Haw. Rev. Stat. Ann. § 445-134.13 (prohibiting pawnbrokers from accepting vehicles as pledged goods or certificates of title as "evidence of possession of pledged goods"); Idaho Code Ann. §§ 28-46-501 *et seq.* (regulating title loans); 205 Ill. Comp. Stat. Ann. 510/1 (excluding individuals and entities that "lend money on the deposit or pledge of "printed evidence of ownership of [] personal property" from the statute's definition of pawnbroker); Iowa Code Ann. § 537.2403 (capping interest rates in title loan transactions); Ky. Rev. Stat. Ann. §§ 286.10-200 *et seq.* (regulating title loans); La. Stat. Ann. § 37:1801 (prohibiting "title only" pawn transactions); Me. Rev. Stat. tit. 30-A, § 3960(3) (excluding "documents evidencing title to motor vehicles" from the pawn statute's definition of "tangible personal property"); Mass. Gen. Laws Ann. ch. 140, § 76 (excluding loans on written evidences of ownership of property from certain statutes applicable to pawnbrokers); Minn. Stat. Ann. § 325J.095 (establishing requirements for pawnbrokers that make title loans); Minn. Stat. Ann. § 47.602 (regulating title lenders that are not licensed pawnbrokers); Miss. Code. Ann. §§ 75-67-401 *et seq.* (regulating title loans); Mo. Rev. Stat. Ann. §§ 367.512 *et seq.* (regulating title loans); Nev. Rev. Stat. Ann. §§ 604a.5065 (regulating title loans); N.H. Rev. Stat. Ann. §§ 399-a:1 *et seq.* (regulating title loans); Ohio Rev. Code Ann. § 4727.08(E) (requiring that a pawnbroker take possession of both the motor vehicle and the certificate of title to the motor vehicle in a motor vehicle pawn transaction); Or. Rev. Stat. Ann. §§ 725A.010 *et seq.* (regulating title and payday loans); S.C. Code Ann. § 40-39-10 (excluding certain vehicles and "title" from the pawnbroker statute's definition of "pledged goods"); S.D. Codified Laws §§ 54-4-70 to 54-4-72 (regulating title loans); Tenn. Code Ann. § 45-6-203(8) (excluding title documents from the pawn statute's definition of "pledged goods"); Tenn. Code Ann. § 45-15-101 *et seq.* (regulating title loans); Utah Code Ann. §§ 7-24-101 *et seq.* (regulating title loans); Va. Code Ann. § 54.1-4000 (excluding persons who lend or advance money on the pledge of printed evidences of title from the statute's definition of "pawnbroker"); Va. Code Ann. §§ 6.2-2200 *et seq.* (regulating title loans); W. Va. Code Ann. § 47-26-1(b) (stating pawn transactions do not include transactions where titles are used as security).

[22] *See, e.g.*, *In re Schwalb*, 347 B.R. 726, 748-49 (Bankr. D. Nev. 2006) (holding that title pawn transactions are subject to Nevada's codification of UCC Article 9 and, therefore, the pawn ticket's contractual forfeiture provision was unenforceable); *In the Matter of Cash-N-Go, Inc.*, C-01-CV-20-000101 (Md. Cir. Ct. for Allegany Cnty. Aug. 9, 2021), *available at* https://www.marylandattorneygeneral.gov/news%20documents/081121_Cash_N_Go_Memo.pdf (last visited November 18, 2021) (affirming a final order issued by the Consumer Protection Division of the Office of the Maryland Attorney General dated February 18, 2020, which found that a title loan is not a valid pawn transaction and that the title lender had made unlicensed consumer loans, charged usurious interest rates, made deceptive and misleading statements, failed to state material facts, and engaged in other illegal activity); Colo. Dep't of Law Consumer Prot. Section, Admin. Interpretation, No. 1.202-9401 (Aug. 31, 1994), *available at* https://coag.gov/app/uploads/2019/07/1994-08-31_1.202-9401_pawnbrokers.pdf (last visited November 18, 2021)

51

Notably, unlike Georgia's pawn laws (the subject of *Northington*), which (1) *deem* a title lender to have possession of a vehicle by virtue of its possession of the vehicle's certificate of title, (2) give such a title lender a *statutory right* to take possession of the vehicle upon default, and (3) *categorically include* vehicle certificates of title in the state's definition of pledged goods[23]—the Alabama Pawnshop Act says nothing at all about title loans or certificate of title pledges. Moreover, in Alabama, there are no statutes that specifically regulate title loans. However, in 1993, shortly after the Alabama Pawnshop Act took effect, the Alabama Supreme Court held, in *Floyd v. Title Exch. and Pawn of Anniston, Inc.,* 620 So. 2d 576 (Ala. 1993)*,* that a paper certificate of title is capable of possession and is not a chose in action and, therefore, is property that may be pledged under the Alabama Pawnshop Act. *See id.* at 579. Thus, under Alabama law, a paper certificate of title is regarded as tangible, pledgeable personalty under the Alabama Pawnshop Act.

That said, in subsequent cases, the Alabama Supreme Court has narrowly construed its holding that a paper certificate of title is tangible, pledgeable personalty within the meaning of the

---

("It is the position of the Administrator of the Colorado Uniform Consumer Credit Code that 'auto-pawn' transactions are in fact secured loans when the pawnbroker does not retain possession of the vehicle.").

[23] *See* Ga. Code Ann. § 44-12-130 ("'Pledged goods' means tangible personal property, including, without limitation, all types of motor vehicles or any motor vehicle certificate of title, which property is purchased by, deposited with, or otherwise actually delivered into the possession of a pawnbroker in connection with a pawn transaction. However, for purposes of this Code section, possession of any motor vehicle certificate of title which has come into the possession of a pawnbroker through a pawn transaction made in accordance with law shall be conclusively deemed to be possession of the motor vehicle, and the pawnbroker shall retain physical possession of the motor vehicle certificate of title for the entire length of the pawn transaction but shall not be required in any way to retain physical possession of the motor vehicle at any time. 'Pledged goods' shall not include choses in action, securities, or printed evidences of indebtedness."); *see also id.* § 44-12-131(a)(3) ("Unless otherwise agreed, a pawnbroker has upon default the right to take possession of the motor vehicle."); *id.* § 44-12-131(a)(4)(C) (permitting certain fees in pawn transactions involving motor vehicles or motor vehicle certificates of title, including a lien recordation fee); *id.* § 44-12-138(15) (requiring, "if the pawn transaction involves a motor vehicle or motor vehicle certificate of title," that the pawnbroker deliver a written disclosure to the pledgor stating "that the pawnbroker may charge a fee to register a lien upon the motor vehicle certificate of title, not to exceed any fee actually charged by the appropriate state to register a lien upon a motor vehicle certificate of title… but only if the pawnbroker actually places such a lien upon the motor vehicle certificate of title"); *id.* § 44-14-400 (making the pawnbroker's statutory lien on pledged goods inferior to judgment liens and other general liens reduced to execution and levy); *id.* § 44-14-403(a) (giving pawnbrokers a statutory lien on pledged goods and the right to retain possession of the pledged goods until the lien is satisfied); *id.* § 44-14-403(b)(3) (providing for the automatic extinguishment of any "ownership interest of the pledgor or seller as regards the pledged item" upon expiration of the statutory grace period for redeeming); *id.* § 44-14-408 (making provision for the satisfaction of pawnbroker liens).

52

Alabama Pawnshop Act, stating "*Floyd* holds *only* that 'an automobile certificate of title is "tangible personal property" within the meaning of the Alabama Pawnshop Act,' and that 'money-lending transactions involving the transfer of automobile certificates of title for the purpose of giving security are "pawn" transactions.'" *Ex parte Coleman*, 861 So. 2d 1080, 1086 (Ala. 2003) (emphasis added) (quoting *Blackmon v. Downey*, 624 So. 2d 1374, 1376 (Ala. 1993)). The undersigned finds no Alabama Supreme Court case, and TitleMax cites to none, wherein the Alabama Supreme Court has held that a vehicle in a title loan transaction is also a pledged good within the meaning of the Alabama Pawnshop Act.

Significantly, a certificate of title is not a document of title. *See* Ala. Code §§ 7-1-201(b)(16), 7-7-201(b), 7-9A-102(a)(30); *see also Schwalb*, 347 B.R. at 745-47 (rejecting a title lender's constructive possession argument because a certificate of title is not a document of title under the UCC); *Matter of Emergency Beacon Corp.*, 665 F.2d 36, 41-42 (2d Cir. 1981) (concluding that "a vehicle certificate of title is not a 'document of title' as the latter term is used by the U.C.C."); *Nat'l Exch. Bank of Fond du Lac v. Mann*, 260 N.W.2d 716, 719 (Wisc. 1978) ("Automobile certificates of title have not generally been accorded the legal status of documents of title as that term is used in the Uniform Commercial Code because vehicle certification statutes based upon the Uniform Act do not recognize a pledge of the certificate as effective to perfect an interest"); Gilmore § 20.5, at 566 (noting that title to a vehicle is not "locked up" in a vehicle certificate of title in the same manner as title is "locked up" in a document of title because, under the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act, the pledge of a vehicle's certificate of title is not effective to perfect an interest in the vehicle); *see also id.* § 1.4, at 17 ("The most important feature of a negotiable document of title is that the issuer is entitled to deliver the goods only to a holder of the document and is required to take up and cancel the document when

53

delivery is made").  A document of title is a document that gives the holder both title to and a right to possession of goods in the possession of a bailee (typically a warehouseman or carrier).  And, under the UCC, even a document of title must be negotiable for the secured party's possession of the document to give the secured party a perfected security interest in both the document of title and the goods covered thereby.  *See* Ala. Code §§ 7-9A-312, 7-9A-313(a), (c); *see* Gilmore § 14.1, at 439 ("This…represents a change from pre-Code law in the case of non-negotiable documents of title, which had always been looked on as pledgeable").  Further, if the collateral is not a document of title (negotiable or non-negotiable), a secured party is not given the right to proceed both as to the document *and* the goods covered by the document upon default.  *See* Ala. Code § 7-9A-601(a).  In other words, under the UCC, "a record or writing stands proxy for goods it covers only if it is a [UCC] 'document of title.'"  *Schwalb*, 347 B.R. at 745-46.

Also significantly, a record owner's delivery of an unendorsed certificate of title does not evidence an absolute title transfer, *see* Ala. Code § 32-8-44(a), nor is a record owner's retention of a certificate of title sufficient to prevent, as between the parties, the passage of title from the seller to the buyer.  *Wood Chevrolet Co., Inc. v. Bank of the S.E.*, 352 So. 2d 1350, 1352-53 (Ala. 1977) ("[N]on-delivery of a certificate of title at the time of a sale does not prevent the passage of title from the seller to the buyer.");  *Crum v. Southtrust Bank of Ala.*, *N.A.*, 598 So. 2d 867, 872 (Ala. 1992) ("[Seller] also failed in his attempt to retain title to the used automobiles by holding the certificates of title.").  A certificate of title is prima facie evidence of the record owner's ownership (and of any record liens), but these presumptions are rebuttable.  *See* Ala. Code § 32-8-39(d); *Ranger Ins. Co. v. Whitlow*, 514 So. 2d 1338, 1342 (Ala. 1987) ("The certificate of title only 'establishes prima facie title in the person whose name appears on the certificate…'; this presumption of ownership can be rebutted by other indicia of ownership.");  *Ledbetter v. Darwin*

54

*Dobbs Co., Inc.*, 473 So. 2d 197, 201 (Ala. Civ. App. 1985) ("[T]here is a transaction of purchase when there is a delivery of possession from the seller…to the buyer…with the intent that the buyer…become the owner.").

The pledge of an endorsed certificate of title may be sufficient to give a lender a security interest in the vehicle, as the endorsed certificate is a writing signed by the debtor that evidences the transfer of an interest in the vehicle to the secured party (*see* Ala. Code § 7-9A-203(b)); however, the secured party's possession of such a certificate would not perfect the security interest in the vehicle (for that, recordation of the secured party as lienholder is required, with limited exceptions not applicable here). *See id.* §§ 7-9A-311, 7-9A-313(b), 7-9A-316(d), 32-8-2(18), 32-8-2(19), 32-8-61(b), 32-8-62. Moreover, just as a bill of sale subject to a repurchase right can be characterized as a chattel mortgage when given to secure a debt, delivery of an endorsed certificate of title subject to a redemption or repurchase right likely would not effect an absolute title transfer under the common law of Alabama or escape classification as a secured credit transaction under the Alabama UCC.

Notably, no security interest attaches to a vehicle by virtue of a debtor's possession and delivery of the vehicle's unassigned certificate of title to the debtor's lender if the delivery is unaccompanied by a written security agreement. *See Pressley*, 100 So. 3d at 1060, 1065-69 (debtor orally agreed to give his grandmother a lien on his vehicle in exchange for the purchase money and delivered the certificate of title to her; oral agreement held not to constitute a valid security agreement under Ala. Code § 7-9A-203(b)). And, even the fact that a debtor has possession of a vehicle certificate of title and is listed as the record owner does not conclusively establish that a security agreement signed by the debtor is enforceable; in other words, a security interest cannot attach to a vehicle that the debtor has already sold merely because record ownership has not been

55

transferred from the debtor to the debtor's purchaser.  *Emergency Beacon Corp.*, 665 F.2d at 42; *Nat'l Exch. Bank*, 260 N.W.2d at 718-19.

When a secured party involuntarily transfers record title to itself (or a transferee) by executing the assignment and warranty of title section of a certificate of title (i.e., endorsing the certificate) and making application for a new certificate of title—which application, in Alabama, must be accompanied by an affidavit attesting to the secured party's repossession of the vehicle *see* Ala. Code § 32-8-46(b)—the secured party is enforcing its rights under its security agreement, not the certificate of title recording its lien.  *See id.*  And, in the case of a voluntary title transfer, a bill of sale or other evidence of an absolute title transfer must be submitted to the Alabama Department of Revenue along with the assigned certificate to obtain a new certificate of title recording the transferee as the record owner.  *See* Ala. Admin. Code r. 810-5-75-.36.   In other words, though a certificate of title has quasi-negotiable qualities, it does not appear that even an endorsed certificate is regarded as a bearer instrument capable of transferring ownership of the covered vehicle solely by the record owner's delivery of the certificate to the named assignee, much less that an unendorsed certificate is subject to such classification (the delivery of which is ineffective to transfer or perfect a security interest in the vehicle).  In other words, by statute, the assignment of a certificate of title is evidence of a title transfer, but it is not, necessarily, a substitute for a valid instrument of conveyance.  *See* Ala. Code §§ 32-8-39(d), 32-8-44(a); *Crowley v. State Farm Mut. Auto. Ins. Co.*, 591 So. 2d 53, 55 (Ala. 1991) (explaining that "the absence of ownership indicated by the absence of a certificate of title…can be rebutted by other evidence of ownership. For example, ownership or a transfer of ownership can be established by evidence of a party's taking possession of the vehicle; by evidence of a bill of sale that manifests an intent to sell and

56

transfer the vehicle and to grant dominion and control over it; and by evidence of a transfer of money for the vehicle.").

Fundamentally, then, a vehicle certificate of title is a record, the legal significance of which lies in the information recorded thereon and presumptively evidenced thereby. In other words, a certificate of title is not intended to operate as an assignment or transfer but, instead, as evidence of an assignment or transfer (be it absolute or conditional). A certificate of title is not a substitute for the vehicle described therein. The right to possess a certificate of title turns on whether the person in possession holds record title or a lien. *See Crum*, 598 So. 2d at 873; Ala. Code § 32-8-41. However, possession of a certificate of title is not determinative of the question of where title to the covered vehicle lies. *See Pressley*, 100 So. 3d at 1060, 1065-69; *Crum*, 598 So. 2d at 873; *Wood Chevrolet Co.*, 352 So. 2d at 1352-53. And ownership of a certificate of title (to the extent the record is capable of ownership)[24] follows the title to the vehicle, not the other way around. *See, e.g.*, *Crum*, 598 So. 2d at 873 (holding the record owner had sold vehicle to plaintiff, entitling plaintiff to possession of the operative certificate of title and issuance of a new certificate of title recording plaintiff as owner and record owner's secured creditor as lienholder).

Here, there is no allegation that the Original Certificate or the Replacement Certificate was validly assigned or endorsed by Hambright; thus, neither the information recorded on the certificates, nor the delivery of the certificates to TitleMax, is effective to transfer a valid security

---

[24] *See, e.g.*, Ala. Code § 35-4-9 ("Instruments essential to the title of real property and which are not kept in a public office, as a record, pursuant to law, belong to the person in whom for the time being such title may be vested and pass with the title") (emphasis added). Generally speaking, a thing may be "property" if it is capable of ownership or if possession of it confers a benefit on the person in possession. *See, e.g.*, *Gleason v. Thaw*, 236 U.S. 558, 561 (1915) (stating property "denotes something subject to ownership, transfer, or exclusive possession and enjoyment, which may be brought within the dominion and control of a court through some recognized process."); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) ("[T]he word 'property' has a naturally broad and inclusive meaning. In its dictionary definitions and in common usage 'property' comprehends anything of material value owned or possessed.") (internal citations omitted); Black's Law Dictionary defines "property" as "[A]ny external thing over which the rights of possession, use, and enjoyment are exercised." *See Property*, Black's Law Dictionary (11th ed. 2019). As such, a certificate of title need not be capable of ownership to be pledgeable.

57

interest in the Vehicle, or legal title or absolute title to the Vehicle, to TitleMax. However, there is a separate written security agreement, which granted TitleMax a security interest in the Vehicle and might be sufficient to transfer conditional and defeasible legal title to the Vehicle to TitleMax under the Alabama common law of chattel mortgages (in either case, the interest is subject to classification as a lien under the Bankruptcy Code and the Alabama Certificate of Title Act). Under the Alabama Certificate of Title Act, TitleMax has the right to transfer record title to itself or a transferee upon default and repossession. Thus, if one construes the Alabama Supreme Court's holding that there be a "transfer of a certificate of title as security" as requiring that the vehicle described in the certificate (and not merely the certificate itself) secure the title loan transaction, or as requiring that the debtor transfer at least conditional and defeasible legal title to, or a lien on, the vehicle to the pawnbroker, this undoubtedly is the case (albeit due to the parties' security agreement, not the pledge of the Original Certificate or the Replacement Certificate).

Moreover, Hambright delivered the Original Certificate to TitleMax at the inception of the first loan. Hambright did not give up possession of the Replacement Certificate, as Hambright never had (and was never entitled to have) possession of it (*see* Ala. Code § 32-8-41), but there was a parting with control of the Original Certificate at the time of the initial loan transaction. And, the court assumes for purposes of this opinion that, at the time of the Loan, the Replacement Certificate was maintained in tangible form and was and remains in the possession of TitleMax. Therefore, the court also assumes, for purposes of this opinion, that the Loan is subject to classification as a pawn transaction and that the Replacement Certificate is subject to characterization as a pledged good. [25]

---

[25] Hambright's answer to the Complaint avers that the transaction is not a valid pawn transaction. (*See* AP Doc. 7 at 3.) For purposes of the court's ruling on the pending summary judgment motions, the court assumes that the transaction is subject to characterization as a pawn transaction. As the court concludes that characterization of the transaction as a pawn is not, ultimately, determinative of the question of the parties' respective rights and interests in the Vehicle,

58

While this court cannot say, conclusively, that forfeiture of a validly endorsed certificate of title does not effect an absolute title transfer (as this is not at issue here), even a good sold subject to a repurchase right (i.e., a good mortgaged as a matter of Alabama common law, not merely pledged) must be left with the pawnbroker for the transaction to be regarded as a pawn, and the good sold/mortgaged to be regarded a pledged good under the Alabama Pawnshop Act. *See id.* § 5-19A-2(4). Given this distinction, it does not appear that the Alabama legislature intended for non-possessory chattel mortgagees to receive the same rights, upon default, as possessory chattel mortgagees, and the court sees no conflict between the Alabama UCC and the Alabama Pawnshop Act in recognizing and giving effect to the rights of a debtor/mortgagor in possession. The Alabama Pawnshop Act plainly contemplates that the pawnbroker will take possession of any pledged good, and that the pawnor will part with possession. *See id.* § 5-19A-2(4), (6). The Alabama Pawnshop Act's statutory lien is dependent upon possession. *See id.* § 5-19A-10 ("The pawnbroker shall retain possession of the pledged goods except as otherwise herein provided until the lien is satisfied."). The pawnbroker must hold pledged goods (be they purchased by, or pledged to, the pawnbroker) for a period of time. *See id.* § 5-19A-5(c), 5-19A-10(b). The Alabama Pawnshop Act does not prohibit a pawnbroker from taking additional collateral for a pawn. Certainly, when the thing pawned is a writing, the writing must not be a chose in action (i.e., it must be at "least a little bit negotiable," *see* Gilmore § 1.3, at 16), which was not the case under Alabama's prior pawn laws (which permitted the pawning of choses in action). *Compare* Ala. Code § 5-19A-2(6) *with id.* § 8-1-80(a) (1975), *repealed by* Acts 1992, No. 92-597 (eff. May

_____

the court need not reach this issue to dispose of the AP. However, if the court's state law conclusions are erroneous, further proceedings to determine whether the transaction is or is not a pawn may be necessary, as the court cannot, based on the record before it, definitively answer this question. Without limitation, it is unclear whether the Vehicle's certificate was maintained in tangible or electronic form at the time of the Loan (*see* Ala. Code § 32-8-41), and a question exists as to whether the Agreement contains a provision requiring the personal liability of Hambright. *See* Agreement (AP Doc. 13, Ex. A at 8, ¶¶ 22(l)); Ala Code § 5-19A-8; *Complete Cash Holdings, LLC v. Fryer*, 297 So. 3d 1223, 1232 n.9 (Ala. Civ. App. 2019).

59

21, 1992) ("Every person engaged in the business of pawnbroking must, upon receiving as security for the loan of money or other thing of value any personal property *or chose in action*, enter in a book a full description thereof…") (emphasis added). But, it does not follow that the right bound up in an endorsed certificate of title is absolute ownership of the vehicle described therein when the transaction is a secured credit transaction and the vehicle covered by the certificate is not, itself, subject to the Alabama Pawnshop Act's forfeiture provision.

Of course, it is largely irrelevant that the undersigned is not satisfied that forfeiture of a validly endorsed certificate of title to a pawnbroker effects an unconditional and indefeasible transfer of title to the vehicle described therein because, here, there is no allegation that the forfeited certificate was assigned by Hambright. In other words, the Replacement Certificate does not even purport to transfer title from Hambright to the secured party (conditional or absolute). It records TitleMax as first lienholder, but TitleMax's security interest in (i.e., its lien on or conditional and defeasible legal title to) the Vehicle derives from the security agreement included as part of the Agreement, not the pledge of the Replacement Certificate. The pledge and recordation of TitleMax as lienholder on the Replacement Certificate, and TitleMax's retention of possession of the Replacement Certificate, are merely means by which TitleMax's Article 9 security interest in the Vehicle is perfected and preserved for a period of time.

Accordingly, the assertion that forfeiture, under the Alabama Pawnshop Act, vested TitleMax with absolute title to the Vehicle is only plausible if the Vehicle, itself, is a pledged good. If the Vehicle is not a pledged good, forfeiture of the Replacement Certificate is of little consequence, as the Debtor has no right to possession of the Replacement Certificate until TitleMax's security interest in the Vehicle is satisfied, deemed satisfied, or discharged. *See* Ala. Code § 32-8-41. However, if TitleMax's security interest in the Vehicle is discharged in

60

Hambright's bankruptcy, Hambright will be statutorily entitled to a release of TitleMax's rights on the certificate or a new certificate of title for the Vehicle recording that she owns the Vehicle free of TitleMax's interest. *See id.* § 32-8-64(a).

Ultimately, were the court to look at the plain language of the Alabama Pawnshop Act, alone, the court would have little trouble concluding that the Vehicle is not a pledged good within the meaning of the Act, as it was not left with TitleMax or otherwise delivered into the possession of TitleMax but has, instead, remained in Hambright's possession. Further, the court would have little trouble applying the Alabama UCC and (nondisplaced) Alabama common law to determine the parties' and Estate's respective rights and interests in the Vehicle (as distinguished from the operative certificate of title), given that the Loan Agreement plainly evidences a secured credit transaction, and the Alabama Pawnshop Act's forfeiture provision is a narrow, codified exception to the Alabama UCC's anti-forfeiture provisions and the Alabama common law's anti-forfeiture rules. Additionally, the court does not believe it was commercially reasonable for TitleMax to expect that all of Hambright's (and now her Estate's) rights to and interest in the Vehicle would be forfeited to it on default as (1) Hambright was permitted to retain and use the Vehicle; (2) the Alabama UCC and common law invalidate the Agreement's contractual forfeiture provision to the extent it purports to forfeit Hambright's equitable title, UCC redemption right, or UCC surplus right or effect a pre-agreed strict foreclosure; (3) the only property left with TitleMax at the pawn's inception was the Vehicle's certificate of title (which has already been replaced once by TitleMax and has not been assigned or endorsed by Hambright); (4) the Loan Agreement describes TitleMax's interest in the Vehicle as a security interest; (5) the Loan Agreement treats the certificate of title for the Vehicle and the Vehicle as separate property; (6) the undersigned's predecessor held in *In re Mattheiss*, 214 B.R. 20, 30 (Bankr. N.D. Ala. 1997) (Stilson, J.) that a

61

title lender out of possession holds only a non-possessory security interest in the vehicle (i.e., that a vehicle is not a pledged good in a title loan transaction); and (7) the Alabama Court of Civil Appeals has relied on *Mattheiss* to characterize a title lender's interest in a Vehicle (post-forfeiture) as an unperfected, Article 9 security interest (not ownership). *Harkness*, 724 So. 2d at 33. In other words, although TitleMax characterizes its interest in the Vehicle as an "executory interest," nothing in the parties' Agreement supports this characterization, and the rationales for allowing forfeiture in conditional sale transactions and traditional pawn transactions make little sense in the context of a non-purchase money loan transaction secured by a non-possessory security interest in a valuable, movable asset.

B.     *The Discrete Issues*

i.     Defining What is and is not Binding Precedent

So, why the need for such a long, belabored opinion?—because the federal judiciary follows precedent, and, while the Alabama Supreme Court has not stated, in a holding or in dicta, that a vehicle subject to a non-possessory security interest of a pawnbroker is a pledged good subject to forfeiture under the Alabama Pawnshop Act, other courts have. For instance, some bankruptcy courts and federal district courts in Alabama have adopted a theory of constructive possession to characterize a vehicle in a pawnor's actual possession as in the constructive possession of the pawnbroker, subjecting the vehicle to forfeiture as a pledged good under the Alabama Pawnshop Act. *See, e.g.*, *TitleMax of Ala., Inc. v. Barnett*, No. 5:20-CV-00181-CLM, 2021 WL 426218, at *3 (N.D. Ala. Feb. 8, 2001) (Maze, J.); *In re Thompson*, 609 B.R. 443, 449-50 (M.D. Ala. 2019) (Creswell, J.), *aff'd*, 621 B.R. 278 (M.D. Ala. 2020) (Huffaker, J.). As discussed more fully below, this theory finds its origin in the Alabama Supreme Court's recitation, in *Floyd*, of the trial court's legal conclusions. However, under general commercial law principles,

62

a debtor cannot be its lender's agent for purposes of constructive possession, and, in *Coleman*, the Alabama Supreme Court expressly rejected a title lender's theory of constructive possession, calling into question the viability of this theory. *See Floyd*, 620 So. 2d at 579*; see also Coleman,* 861 So. 2d at 1086. For its part, TitleMax disclaims any theory of its constructive possession of the Vehicle in this proceeding.

On the other end of the spectrum is *Mattheiss*, 214 B.R. at 34-35, wherein the undersigned's predecessor held that a title lender has only a non-possessory security interest in a vehicle in a title loan transaction, requiring recordation of the title lender as lienholder on the vehicle's certificate of title to perfect this security interest. Significantly, in an opinion agreed to by a majority of the Court's Judges, the Alabama Court of Civil Appeals relied on *Mattheiss* to characterize a title lender's interest in a vehicle (post-forfeiture) as an unperfected security interest. *See Harkness,* 724 So. 2d at 33. However, in two subsequent plurality decisions, the Alabama Court of Civil Appeals has suggested, in dicta, that vehicles in title loan transactions are subject to characterization as pledged goods under the Alabama Pawnshop Act. *See, e.g.*, *Pattans Ventures, Inc. v. Williams*, 959 So. 2d 115, 121-22 (Ala. Civ. App. 2006) (Judge Crawley authored the opinion; Judges Murdock and Bryan concurred in the result, without writing; Judge Thompson concurred in the result only, and filed a concurring opinion; and Judge Pittman joined in Judge Thompson's concurrence); *Morgan v. Thompson*, 791 So. 2d at 977 (Judge Crawley authored the opinion; Judge Thompson concurred; Judge Yates concurred in the result; and Judges Robertson and Monroe concurred in the result only). The Eleventh Circuit has issued three decisions characterizing vehicles in title loan transactions as pledged goods under Alabama's Pawnshop Act, but none of these decisions are published, and the opinions offer little in the way of explanation for this treatment. *See In re Eldridge,* No. 21-11457, 2021 WL 4129368, at *1 (11th Cir. Sept. 10,

63

2021); *In re Womack*, No. 21-11476, 2021 WL 3856036, at *2-3 (11th Cir. Aug. 30, 2021) (per curiam); *In re Gunn*, 317 Fed. App'x 883 (11th Cir. 2008).[26]

Thus, the court must wade through the case law to identify what is and is not binding or persuasive authority. Of course, "[n]ot all text within a judicial decision serves as precedent. That's a role generally reserved only for holdings: the parts of a decision that focus on the legal questions actually presented to and decided by the court." Bryan A. Garner, et al., THE LAW OF JUDICIAL PRECEDENT § 4, at 44 (2016). "The distinction between a holding and a dictum doesn't depend on whether the point was argued by counsel and deliberately considered by the court…, but instead on whether the solution of the particular point was more or less necessary to determining the issues involved in the case." *Id.* at 51. "Judicial opinions are always premised on a series of assumptions about what the law is. Yet those assumptions—whether implicit or explicit—aren't generally considered precedential. A decision's authority as precedent is limited to the points of law raised by the record, considered by the court, and determined by the outcome. The assumptions a court uses to reach a particular result do not themselves create new precedent or strengthen existing precedent." *Id.* § 6, at 84. Only "if tacitly assumed rules or principles are so essentially involved in the decision that the particular judgment couldn't logically have been given without recognizing and applying them," do they become authoritative. *Id.* at 86.

---

[26] In *Gunn*, the Circuit concluded that the Alabama Pawnshop Act does not prohibit extensions or renewals of a pawn transaction's initial maturity date, such that that the title lender's "initial lien" on the debtor's vehicle remained valid (entitling the title lender to a secured claim in the debtor's bankruptcy). 317 Fed. App'x at 887. In *Womack*, the Circuit concluded that an Alabama title lender was subject to treatment as the holder of a modifiable secured claim because the vehicle became property of the estate by virtue of the debtor's pre-default bankruptcy filing, rendering 108(b) inapplicable. 2021 WL 3856036, at *2-3. And, in *Eldridge* the Circuit held that a belated renewal did not save the parties' transaction from characterization as a pawn transaction and upheld the bankruptcy court's determination that title passed upon the debtor's pre-bankruptcy failure to redeem. 2021 WL 4129368, at *3. It does not appear that the question of whether a vehicle is properly characterized as a pledged good under the Alabama Pawnshop Act was placed at issue in any of the foregoing cases.

Distinguishing between dicta and holdings is particularly important when construing the text of a state statute, as illustrated by *Carroll v. Lessee of Carroll*, 57 U.S. (16 How.) 275 (1853). In *Carroll*, the question before the United States Supreme Court was who owned lands acquired by a testator after the execution of the testator's will. *Id.* at 279-80. The Court was asked to consider the precedential weight of a decision of the Maryland Court of Appeals, wherein the state appellate court made conclusory statements about the land and personalty devised and bequeathed to the testator's wife by the testator's will (stating "she...with but trifling exception, took under the will the whole estate"). *Id.* at 284-85. The Supreme Court concluded that the question of who owned the land was immaterial to the state appellate court's decision (which denied a bill filed by the executors of the wife's estate to enjoin the sale of enslaved persons devised to the testator's wife in his will and manumitted by the wife's own will).[27] *Id.* at 286. Writing for the court, Justice Benjamin Curtis explained:

> If the Court of Appeals had found it necessary to construe a statute of that State in order to decide upon the rights of parties subject to its judicial control, such a decision, deliberately made, might have been taken by this court as a basis on which to rest our judgment. But it must be remembered that we are bound to decide a question of local law, upon which the rights of parties depend, as well as every other question, as we find it ought to be decided. In making the examination preparatory to this finding, this court has followed two rules, one of which belongs to the common law, and the other is a part of our peculiar judicial system. The first is the maxim of the common law, *stare decisis*. The second grows out of the thirty-fourth section of the Judiciary Act, (1 Statutes at Large, 92,) which makes the laws of the several States the rules of decision in trials at the common law; and inasmuch as the States have committed to their respective judiciaries the power to construe and fix the meaning of the statutes passed by their legislatures, this court has taken such constructions as part of the law of the State, and has administered the law as thus construed. But this rule has grown up and been held with constant reference to the other rule, *stare decisis*; and it is only so far and in such cases as this latter rule can operate, that the other has any effect.

> If the construction put by the court of a State upon one of its statutes was not a matter in judgment, if it might have been decided either way without affecting any

---

[27] No enslaved person was a party to the case before the Supreme Court, and enslaved persons were not the subject of the dispute in the case before the Supreme Court.

right brought into question, then, according to the principles of the common law, an opinion on such a question is not a decision. To make it so, there must have been an application of the judicial mind to the precise question necessary to be determined to fix the rights of the parties and decide to whom the property in contestation belongs.

And therefore this court and other courts organized under the common law, has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties. In Cohens *v.* The State of Virginia, 6 Wheat. 399, this court was much pressed with some portion of its opinion in the case of Marbury *v.* Madison. And Mr. Chief Justice Marshall said, 'It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent; other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.' The cases of Ex parte Christy, 3 How. 292, and Jenness et al. *v.* Peck, 7 How. 612, are an illustration of the rule that any opinion given here or elsewhere cannot be relied on as a binding authority, unless the case called for its expression. Its weight of reason must depend on what it contains.

With these views we cannot regard the opinion of the Court of Appeals as an authority on which we have a right to rest our judgment. We have already stated the reasons which have brought us to a different construction of the statute; reasons which do not seem to us to be shaken by the opinion of the Court of Appeals.

*Carroll,* 57 U.S. at 286-87. Thus, while it is true that today's dicta "may well be tomorrow's binding precedent," *see* Garner, THE LAW OF JUDICIAL PRECEDENT § 4, at 69-70, federal courts may not simply rely on unexplained or ill-explained dicta or assumptions when construing the meaning of a state statute, as to do so would give greater weight to non-binding statements of appellate judges than to valid enactments of the state legislature.

Of course, not all holdings of other courts are binding on this court. Importantly, if this court incorrectly characterizes statements made in *Pattans* or *Morgan v. Thompson* as dicta, the statements nevertheless lack the weight of binding precedent because a majority of the Court's judges did not join in the opinions' rationales, and plurality opinions of the Alabama appellate

66

courts are not binding on questions of state law. *See Entrekin v. Internal Med. Assocs. of Dothan, P.A.*, 689 F.3d 1248, 1257-58 (11th Cir. 2012) ("The Alabama Supreme Court has held that '[a]s a 'hornbook' principle of practice and procedure, no appellate pronouncement becomes binding on inferior courts unless it has the concurrence of a majority of the Judges or Justices qualified to decide the cause'….A court's right to pronounce the law includes the right to decide which pronouncements of its judges are law.") (internal citations omitted). Horizontal authorities (e.g., the decisions of other bankruptcy courts) also are not binding on this court. *See* 18 James W. Moore, et al., Moore's Federal Practice § 134.02[d] (3d ed. 2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").[28] And, unpublished opinions of the Eleventh Circuit are not binding on this court. *See* 11th Cir. R. 36-2 (2021); *see also Northington*, 876 F.3d at 1317 n.1 (Wilson, J. dissenting) (noting that had a majority of the *Northington* panel not selected the decision for publication, the precedential weight of the decision would have been limited "to the 'particular' and 'peculiar' facts of the case"). This is not to say that the court can or should simply disregard any of the foregoing authority, as they are persuasive authorities entitled to due consideration by this court. However, the court is not persuaded that the cited persuasive authorities provide a sufficient basis for this court to expand the Alabama Pawnshop Act's statutory forfeiture provision to include a good subject only to a non-possessory security interest of a pawnbroker. The Alabama Supreme Court's holding that a certificate of title is pledgeable

---

[28] A question exists as to whether decisions of individual district judges in multi-judge districts are binding on bankruptcy courts. *See, e.g.*, *In re Hillsborough Holdings Corp.*, 127 F.3d 1398, 1403 n.3 (11th Cir. 1997) (stating that "since the standard of review would not change either way, we see no reason to decide whether district court decisions may constitute binding precedent for bankruptcy courts."). The court need not decide this issue as the only federal district court case cited by TitleMax is *Barnett*, 2021 WL 426218, at *1, wherein the district court relied on a theory of constructive possession to characterize the subject vehicle as a pledged good within the meaning of the Alabama Pawnshop Act. *See id.* at *3-4. TitleMax has disclaimed any theory of its constructive possession of the Vehicle in this proceeding, as such to the extent the district court's holding in *Barnett* is binding, it is not controlling.

67

personalty is narrow, and the undersigned believes that the Alabama Supreme Court's statements (in holdings and dicta) argue against (not in support of) application of the Alabama Pawnshop Act's forfeiture provision to collateral subject to a pawnbroker's non-possessory security interest.

ii.     The Alabama Case Law

As set forth above, the Alabama Supreme Court first took up the question of whether title loans could be characterized as pawn transactions under the Alabama Pawnshop Act in *Floyd v. Title Exch. & Pawn of Anniston, Inc*., 620 So. 2d 576 (Ala. 1993).  The Court, in *Floyd*, quoted various conclusions of law entered by the trial court:

> A certificate of title is clearly, and is perhaps nothing more than, 'evidence of title.' It is *prima facie* evidence of ownership. It is *not*, at least under a traditional analysis, a chose in action—even in that term's broadest sense.
>
> Whether a certificate of title is 'tangible personal property' in a strict legal sense is also questionable, as it has no intrinsic value.  However, it is clear to the court that the business transaction under review herein is not prohibited by the Act. The language of Act 92–597 is sufficiently broad to encompass the practice of allowing a customer to retain physical possession of the pledged property with the pawnbroker retaining 'constructive possession' through exercise of actual physical possession of a set of keys and the endorsed, negotiable certificate of title to it. Whether actual physical possession of the personal property itself is necessary to retain a perfected, superior lien in the property is not an issue before the court.
>
> Had the Legislature intended to prohibit the practice under review herein, it could have specifically so stated. Absent a clear legislative intent to prohibit such a practice, this Court [must] find that the practice is *not* proscribed by Act 92–597.... [T]o make a previously lawful act unlawful, the Legislature would have to do so by clear, intentional language. No such language or intent appears within the four corners of the Act adopted.

*Id.* at 578-79.  However, the court's own holding was narrower:  "[W]e hold…that the legislature has not prohibited the pawning of an automobile certificate of title." *Id.* at 576–77.

Significantly, the Alabama Supreme Court agreed with the trial court that characterizing a certificate of title as "tangible" personal property is questionable.  *See id.* at 579 ("We agree with the trial court that it is questionable whether an automobile certificate of title is 'tangible personal

68

property,' as that term is generally understood, but we also agree with the trial court that an automobile certificate is not a 'chose in action,' which the legislature specifically excluded from the definition of 'pledged goods.'").  Generally speaking, quasi-intangibles (documents that take on good-like qualities because of intangible rights bound up therein) are classified as intangibles, not goods, under the Alabama UCC.  *See generally* Ala. Code § 7-9A-102(a)(44).  The Alabama Supreme Court, when interpreting the Alabama Pawnshop Act, did not invoke the UCC classifications of personal property.  *See Floyd*, 620 So. 2d at 578 ("Our legislature did not specifically state what it meant by the words 'tangible personal property' in the [Alabama Pawnshop] Act, as the legislatures of some other states have done...'Tangible' means '[c]apable of being touched and seen.' *Black's Law Dictionary*, 1456 (6th ed. 1990). 'Personal property' generally includes 'all property other than real estate.'…Broadly speaking, 'property' includes 'every species of valuable right and interest.'") (footnote omitted).  In sum, the Court interpreted the Alabama Pawnshop Act as requiring only that the pledged item be "property," that the pledged item be capable of physical possession, and that it not be a chose in action, printed evidence of indebtedness, or a security.  *Floyd*, 620 So. 2d at 578.

A paper certificate of title is capable of possession and susceptible to classification as "property" because possession of it confers some benefit (at a minimum, the ability to impede the record owner's transfer of record title).  Although the Alabama Supreme Court offered no explanation for its conclusion that a certificate of title is not a chose in action, it is presumably because the certificate is, itself, pledgeable personalty (i.e., a pawnbroker can acquire an attached, perfected security interest in the certificate by possession of the certificate, and possession of the certificate gives the holder of the certificate some invulnerable interest in the right(s) represented by the writing).  As Gilmore explains, "rights arising under simple contracts and the like" (e.g.,

69

contracts of construction, production, sale or service, not represented by negotiable instruments or chattel paper, *see* Gilmore § 1.3, at 14) are "clearly non-pledgeable" choses in action, whereas "instruments, documents and the like which are negotiable, quasi-negotiable or just a little bit negotiable" are "clearly pledgeable" and, therefore, not choses in action. *Id.* § 1.3, at 16. Between these two groupings stretches a "vague no-man's land of what may be loosely referred to as non-negotiable choses in action." *Id.* Broadly speaking, a writing is not a chose in action (i.e., it is pledgeable) if possession of the writing by the creditor will give the creditor an interest in the rights represented by the writing which cannot be defeated by any interest subsequently created by the pledgor. Gilmore § 1.3, at 12-13. Thus, this court does not construe the Alabama Supreme Court's holding that a certificate of title is pledgeable to mean that a certificate of title pledge is a substitute for a vehicle pledge under Alabama law.

It bears mention that, in *Floyd*, the record reflected that the certificate was "endorsed" (i.e., the debtor had executed the assignment and warranty of title provision of the certificate). *See Floyd*, 620 So. 2d at 578-79. In other words, the certificate itself evidenced a title transfer, and its delivery in consideration of the loan was likely sufficient to give the title lender an attached security interest in the vehicle (and the means of perfecting the pawnbroker's non-possessory security interest by recordation). *See* Ala. Code § 7-9A-203. As the recordation of a secured party's lien on a certificate of title, and the Alabama Department of Revenue's delivery of a tangible certificate that records a lien to the first lienholder, are intended to render the secured party's interests in the vehicle invulnerable, it is not hard to see how certificates of title escape classification as choses in action; it does not follow, however, that possession of a certificate of title is a substitute for possession of the covered vehicle under Alabama law. The value of a certificate of title, as distinguished from the vehicle described therein, was laid bare by the *Floyd*

trial court's observation that a certificate "has no intrinsic value." *Floyd*, 620 So. 2d at 578. Thus, the trial court saw fit to adopt a theory of constructive possession (at odds with the general commercial principles of agency discussed above) to bring the vehicle within the Alabama Pawnshop Act's definition of pledged goods. The Alabama Supreme Court declined to go so far and confined its holding to the pledgeability of the certificate itself, without discussing the rights/interests in a vehicle transferred to a pawnbroker by the pledge or forfeiture of the vehicle's certificate of title.

It is also notable that the Alabama Supreme Court quoted the trial court as stating the court was reticent to construe the Alabama Pawnshop Act as prohibiting the pawning of automobile certificates of title because this would "make a previously lawful act unlawful." *See id.* at 579 (quoting the trial judge's conclusions of law). However, as discussed above, Alabama's prior pawn statutes (which date as far back as the 1896 Code of Alabama and remained unchanged for close to a century) did not provide for the automatic forfeiture of pawned items (and, in fact, permitted the pawning of choses in action). Under the prior pawn statutes, the pawnbroker's sale of pawned property was required to divest the pawnor of both legal and equitable title to property—i.e., until sale by the pawnbroker (after the statutorily required notice to the pawnor), the pawnor retained the right to redeem. As such, the *Floyd* trial court's express reticence (and the Alabama Supreme Court's implied reticence) could not have been based on a concern that automatic forfeiture of a vehicle in a title loan transaction was the expected consequence of a debtor/pawnor's default. It is readily apparent that the dispute, in *Floyd*, was whether title loans were entirely excluded from the Alabama Pawnshop Act and, therefore, subject to the licensure requirements and interest rate caps of Alabama's Small Loan Act (which permitted interest charges of only two to three percent per month, *see id.* at 578 n. 3-4), and not whether the Alabama Pawnshop Act's automatic forfeiture

71

provision applies to vehicles that secure title loan transactions. Thus, under *Floyd*, an Alabama title lender that does business as a pawnbroker may legally contract for and receive a monthly pawnshop "charge" of up to 25 percent of the principal amount of a title loan ("in lieu of interest or other charges for all services, expenses, costs, and losses of every nature"), provided the pawnbroker waives recourse against the debtor personally and otherwise complies with the requirements of the Alabama Pawnshop Act and any other applicable laws. *See* Ala. Code § 5-19A-7(a), (b). However, it does not follow that, under *Floyd*, a vehicle in a title loan transaction is subject to forfeiture as a pledged good under the Alabama Pawnshop Act.

Significantly, in *Ex parte Coleman*, 861 So. 2d 1080 (Ala. 2003), the Alabama Supreme Court went further and expressly rejected a title lender's argument that its possession of an allegedly endorsed certificate gave it constructive possession of the vehicle covered thereby. In *Coleman*, the Alabama Supreme Court reversed, in part, an Alabama Court of Civil Appeals decision that affirmed (without opinion) a trial court's entry of summary judgment in favor of a title lender/pawnbroker and two of its employees.[29] *Id*. at 1081-82, 1086. Finding substantial

---

[29] The Colemans brought suit against The Money Tree Outlet, Inc., and two of its employees, following The Money Tree's repossession of the Colemans' vehicle on January 4, 2000. Beginning in May 1999, the Colemans together, and then Ms. Coleman singly, entered into a series of pawn transactions with The Money Tree. *Id*. at 1082. The Colemans borrowed a total of $1,000.00 from The Money Tree. *Id*. At the time of each pawn transaction, the Colemans, or Ms. Coleman, pledged the vehicle certificate of title to secure loan. The Colemans retained possession of the vehicle. The stated maturity date of the final pawn ticket was December 5, 1999, and the 30-day grace period to repay the pawn extended through January 4, 2000. *Id*. In the lawsuit, Ms. Coleman attested by affidavit that The Money Tree, acting through its employee/agent, orally agreed to extend the maturity date of the pawn to January 4, 2000 and to allow her to renew the pawn on said date by paying $500.00 (i.e., the equivalent of two months' worth of interest on the $1,000.00 debt). Ms. Coleman further attested that she attempted to pay $500.00 to renew the pawn on January 4th but that The Money Tree's employees refused the payment and informed her that The Money Tree had repossessed the vehicle. *Id*. at 1083. The Money Tree's records also recorded January 4, 2000 as the date of repossession. *Id*. In the lawsuit, the Colemans alleged that The Money Tree had prematurely and wrongfully taken possession of the vehicle before the expiration of the extended maturity date. Denying wrongdoing, The Money Tree pointed to a provision of the operative pawn ticket prohibiting oral modifications and alleged that it took possession on January 5, 2000 (not January 4th). *Id*. at 1084-85. The Money Tree also averred that its taking was not wrongful because it already had constructive possession of the vehicle by virtue of its possession of the endorsed vehicle certificate of title. The Money Tree moved for summary judgment on the Colemans' claims. The trial court granted the motion, and, on appeal, the Alabama Court of Civil Appeals affirmed. *Id*. at 1082. The Supreme Court granted the Colemans' petition for a writ of certiorari to determine whether the alleged oral agreement modified the written pawn ticket. *Id*. at 1081.

72

evidence of an oral agreement to extend the maturity date of the subject title loan, and of the title

lender's pre-default repossession of the vehicle securing the title loan,[30] the court held that the

appellate court and trial court erred in entering summary judgment in favor of the title lender on

the vehicle owner's breach of contract and conversion claims.  *Id*. at 1086.  In rejecting the title

lender's argument that possession of the vehicle's allegedly endorsed certificate of title gave it

constructive possession of the vehicle (such that its repossession could not have been wrongful),

the Alabama Supreme Court reasoned:

> Relying on *Floyd*…the defendants argue that they already constructively possessed the Colemans' car and that, therefore, they could not have converted the Colemans' car.  Their reliance on *Floyd* is inapposite.  First, *Floyd* does not adopt the *Floyd* trial judge's opinion that a pawnbroker's possession of the keys and an endorsed title certificate to a car constitutes the pawnbroker's constructive possession of the car itself.  Second, the record does not contain substantial evidence that the defendants before us possessed an endorsed title certificate, much less the keys, to the Colemans' car.  Third, *Floyd* does not hold that a pawnbroker can legally repossess a pledgor's vehicle on or before the maturity date of a pawn transaction or that a pawnbroker can legally repossess a pledgor's vehicle within the 30-day grace period following the maturity of the pawn transaction.  *Floyd* holds only that 'an automobile certificate of title is 'tangible personal property' within the meaning of the Alabama Pawnshop Act,' and that "money-lending transactions involving the transfer of automobile certificates of title for the purpose of giving security are 'pawn transactions.'"  *Blackmon v. Downey*, 624 So. 2d 1374, 1376 (Ala. 1993).

*Coleman,* 861 So. 2d at 1085-86.

Although the Supreme Court in *Coleman*, in its statement of procedural facts (*see id*. at

1081-82), referred to the parties' characterization of the transaction as a pawn of the vehicle, the

Alabama Supreme Court's holdings and reasoning in *Coleman* suggest that the Court's recitation

of the parties' treatment of the transaction as a vehicle pawn was intended merely as an

---

[30] Citing the rule allowing proof of an oral modification, notwithstanding a requirement that all changes to a contract be made in writing, the Alabama Supreme Court determined that the Colemans had presented substantial evidence of the existence of an oral agreement to extend the maturity date to January 4th. *Id.* at 1085. The Supreme Court further determined that the Colemans had presented substantial evidence of the Colemans' performance (the tender of the $500.00 double interest payment) and The Money Tree's breach (repossession on the maturity date). *Id.*

acknowledgment that the vehicle undisputedly secured the title loan and that the title lender's possession of the vehicle was not a prerequisite to characterizing the title loan as a pawn transaction. Notably, in subsequent title loan cases, the Alabama Supreme Court has taken care to describe a title lender's interest in a vehicle covered by a pledged certificate of title as a security interest. *See, e.g.*, *Title Max of Birmingham, Inc. v. Edwards*, 973 So. 2d 1050, 1051, 1053 (Ala. 2007).

It is this court's opinion that the *Coleman* court's treatment of the title lender's vehicle security interest as non-possessory, and the *Coleman* court's conclusion that the title lender had no right to possession of the vehicle pre-default, suggests that the Alabama Supreme Court did not consider the vehicle to have been pledged, only the vehicle's certificate of title. At a minimum, by narrowly defining the *Floyd* holding as applying only to the subject certificate of title—not the vehicle—the Alabama Supreme Court recognized that a vehicle and the vehicle's certificate of title are separate property.

Of course, whether the vehicle in *Coleman* was (or was not) a pledged good was not at issue, nor was characterization of the transaction as a pawn transaction. So, as a matter of binding precedent, *Coleman* does not definitively answer whether a vehicle in a title loan transaction is a pledged good as the term is defined by the Alabama Pawnshop Act. However, as persuasive authority, *Coleman* invites the conclusion that a title loan may be a pawn—and therefore a title lender's rate of interest or charges are set by the Alabama Pawnshop Act—but also the conclusion that the pledged good in a title loan transaction is only the certificate of title, not the vehicle. The import of this, of course, is that the Alabama Pawnshop Act's forfeiture provision applies only to pledged goods, and, if a vehicle in a title loan transaction is not a pledged good, the pawnbroker's rights in and to the vehicle are governed by the Alabama UCC and Alabama's common law (to the

74

extent not displaced by the Alabama UCC), which, as discussed above, invalidate any contractual forfeiture provision in the Agreement that purports to forfeit Hambright's (now the Estate's) equitable title or UCC redemption or surplus rights to TitleMax and require affirmative enforcement action to indefeasibly vest legal title and equitable title to the Vehicle in TitleMax.

Support for the court's conclusion that a vehicle in a title loan transaction is not a pledged good subject to forfeiture is found in *Harkness v. EZ Pawn Ala., Inc*., 724 So. 2d 32 (Ala. Civ. App. 1998), wherein, the Alabama Court of Civil Appeals, citing Judge Stilson's holding in *Mattheiss*, concluded that title loans are subject to characterization as secured transactions under Old Alabama Article 9 and that the Alabama Certificate of Title Act provides the exclusive method of perfecting a security interest in a motor vehicle covered by the Act. *Id.* at 33. Notably, although the factual recitations suggest that the redemption period for the final pawn transaction expired long before the title lender's repossession (*id.* at 32-33), the court classified the lender's interest as an unperfected security interest at the time of repossession—not absolute title. *Id.* at 33. As set forth above, by definition and legal effect, a security interest is something less than absolute title. TitleMax has averred it can acquire absolute title to the Vehicle before its security interest therein is extinguished, and, if a vehicle in a title loan transaction is a pledged good, this might very well be the case (as forfeiture is not a disposition or a post-default acceptance, and, therefore may not extinguish a pawnbroker's Alabama Article 9A security interest in a pledged good). Unfortunately, this means simply that the *Harkness* court's characterization of the subject title lender as a secured party, and its interest as a security interest, does not definitively answer the question of whether a vehicle is (or is not) a pledged good.

TitleMax and some federal courts point to a subsequent Alabama Court of Civil Appeals decision, *Pattans*, 959 So. 2d 115, to support treating a vehicle in a title loan as a pledged good

notwithstanding the debtor's continued, actual possession of the vehicle.  In *Pattans*, the court stated that, at the time of the title lender's post-redemption period repossession, the pawnbroker "merely took possession of a vehicle that legally belonged to it."  *Id*. at 121-22.  Because the court cited to the automatic forfeiture provision, courts have treated this statement as a conclusion or assumption that the vehicle, itself, was subject to classification as a pledged good.  Notably, the *Pattans* court did not expressly characterize the vehicle as a pledged good and also cited to *Harkness* to support its conclusion that the title lender was entitled to repossess upon expiration of the redemption period.  *Id*. at 122, n.3.  Furthermore, the result in *Pattans*— the setting aside of the trial court's entry of a judgment for the value of the vehicle based on the creditor's sale of the property in violation of section 5-19A-5(c) of the Alabama Pawnshop Act—did not depend on legal or equitable title vesting in the pawnbroker prior to repossession.  *Id.* at 123.  In other words, whether the vehicle had been forfeited or whether the creditor was merely enforcing its rights as a secured party was not outcome determinative, meaning that characterization of the vehicle as pledged good (to the extent *Pattans* can be so construed), without explanation or analysis, is mere dicta.  Absent any explanation as to why the opinion's author considered the vehicle a forfeited pledged good (to the extent he did)—did the opinion's author rely on a theory of constructive possession at odds with *Coleman*? did the judge regard the agreement as an executory agreement to pledge that was perfected to an enforceable pledge upon repossession?—the utility of this dicta (in this no majority case) is minimal.   Additionally, as noted above, *Pattans* is a plurality opinion. While on the same facts, a lower court may be required to reach the same result, the *Pattans* court's rationale is not binding.

Notably, in a case that pre-dates *Coleman*, the Alabama Court of Civil Appeals stated that "title to" an automobile securing a title loan transaction "would have vested" in the pawnbroker

upon expiration of the Alabama Pawnshop Act's redemption period, *see Morgan v. Thompson*, 791 So. 2d at 978, but it appears there was no dispute that the pawnbroker's interest would have ripened to ownership but for the pre-forfeiture seizure of the vehicle by the state of Alabama. *Id.* As such, no explanation is given for the statement, in dicta, that title "would have vested," and, like *Pattans*, *Morgan v. Thompson* is a plurality opinion.

In the most recent Court of Appeals decision to address title pawns, *Complete Cash Holdings, LLC v. Fryer*, 297 So. 3d 1223 (Ala. Civ. App. 2019), characterization of vehicles in title loan transactions as having been "pledged" was not at issue—the issue was whether a pawnbroker/title lender had committed fraud on the court by petitioning for and obtaining judgments against pawnors when the vehicles securing the pawns were lost, destroyed, withheld, or sold by the pawnors. Notably, *Complete Cash* does not discuss the Alabama Pawnshop Act's definition of pledged goods or state, in dicta or a holding, that vehicles in title loan transactions are pledged goods within the meaning of the Act. To be sure, *Complete Cash* does not foreclose characterization of vehicles as pledged goods within the meaning of the Alabama Pawnshop Act and may be premised on an implicit assumption that they are, but *Complete Cash* is not binding precedent on the legal question of whether a vehicle in a title loan transaction is or is not subject to characterization as a pledged good.

Importantly, the only significance the Alabama Supreme Court, in *Coleman*, expressly attached to the pawnor's pledge of the vehicle's (allegedly) endorsed certificate of title was that, post-forfeiture, the pawnbroker's remedy was to take possession of the vehicle described therein. *Coleman,* 861 So. 2d at 1085-86. Of course, all secured parties with valid security interests in vehicles have the state law right to take possession post-default, regardless of whether their interests are regarded as legal title or mere liens (and regardless of whether their security interests

77

are perfected and enforceable against non-debtor third parties). It is federal law that enjoins such affirmative actions and allows for avoidance or subordination of unperfected security interests for the benefit of unsecured creditors. Further, having waived recourse against Hambright personally, TitleMax must look to its collateral to satisfy the Loan outside of bankruptcy.

iii.     <u>The Court's Answer to the Determinative State Law Question</u>

Ultimately, the Alabama Pawnshop Act requires a pawnbroker's possession of pledged goods and a pawnor's dispossession of pledged goods. TitleMax concedes that all it ever had in its possession was a certificate of title for the Vehicle, and it does not argue in this proceeding that its possession of the certificate of title gave it constructive possession of the Vehicle. Moreover, TitleMax does not explicitly argue that the parties could effect a pre-agreed forfeiture of Hambright's UCC rights, or common law equitable title, by contract, and, to the extent it has implicitly so alleged, the court concludes otherwise.

There also is no allegation that Hambright executed the assignment and warranty of title section of the operative certificate (i.e., there is no allegation that the record owner, Hambright, endorsed the Replacement Certificate). And, even if the certificate were endorsed, the record itself would be no more than a chattel mortgage, given that it was delivered as security for a loan, and not in connection with a sale. Such a record's forfeiture could give no more rights to a pawnbroker than a common law chattel mortgagee out of possession would have upon default. Undoubtedly, there is value to a secured creditor in possessing a certificate of title for a vehicle in which it holds a security interest—which is likely why the Alabama Supreme Court afforded quasi-good status to certificates of title in holding that certificates of title are not choses in action but are pledgeable property, in their own right. By statute, the record is TitleMax's to possess (if maintained in tangible form) for so long as it remains a lienholder under the Alabama Certificate of Title Act.

78

However, this court finds little in the way of persuasive authority and nothing in the way of binding authority to support the conclusion that forfeiture of an unassigned certificate effects an absolute title transfer to the vehicle described therein.

One need look no further than certain of the factual scenarios recited in *Complete Cash*, and holdings such as *Mattheiss*, to understand why title lenders began perfecting their security interests in vehicles securing title loan transactions, instead of obtaining and maintaining possession of endorsed certificates of title. But, as title loan transactions in Alabama have evolved to look more and more like other non-recourse, non-possessory, secured credit transactions—with pawnbrokers not retaining possession of the purportedly pledged certificates (instead relinquishing them to the Alabama Department of Revenue, notwithstanding the possessory requirements of the Alabama Pawnshop Act) or obtaining valid assignments of the pledged certificates—the undersigned is of the opinion that courts should take care not to conflate the Alabama Supreme Court's holding that a paper certificate of title is pledgeable personalty with an implicit holding that all vehicles in all title loan transactions are pledged goods subject to forfeiture under the Alabama Pawnshop Act. Therefore, this court will confine the Alabama Supreme Court's holdings to what it has said—that is, until the Alabama legislature says otherwise, a title lender that is a licensed pawnbroker can charge interest of 25 percent per month (absent another applicable statutory limitation on interest) so long as the vehicle's tangible certificate of title is delivered to the pawnbroker and maintained in tangible form for the duration of the pawn, the title lender acquires a security interest in the covered vehicle, the loan is non-recourse, and the pawnbroker otherwise satisfies the requirements of the Alabama Pawnshop Act.

The fact that the result in Alabama is different than in Georgia (the subject of *Northington*) is expected, as Georgia's laws are materially different. Another state's materially different pawn

79

statutes do not control this court's interpretation of the Alabama Pawnshop Act (or permit this court to read ambiguity into the Act's provisions where no such ambiguities exist), and, importantly, the Alabama legislature has not seen fit to expand the Alabama Pawnshop Act's definition of pledged goods to encompass any goods subject to non-possessory security interests. Of course, the Alabama legislature also has not followed the lead of Florida and other states and amended the Alabama Pawnshop Act to categorically exclude certificates of title from the Act's definition of pledged goods. This means title loans may be pawns in Alabama, but it does not mean that vehicles in title loan transactions are pledged goods within the meaning of the Alabama Pawnshop Act.

It also bears mention that the court's state law conclusions do not deny TitleMax of the benefit of its bargain. If the Vehicle is not a "pledged good," this simply means that TitleMax's interest in the Vehicle is a non-possessory, non-purchase money security interest subject to the provisions of Alabama Article 9A, the Alabama common law (to the extent not displaced), the Alabama Certificate of Title Act, and any other applicable state laws. TitleMax has not lost its investment by this ruling, merely its claim to Hambright's (now the Estate's) equity in the Vehicle (if any). The court is not unmasking TitleMax's security interest or looking to the substance of the transaction to disregard the form. The court is simply concluding that, in substance, TitleMax's interest in the Vehicle is precisely what TitleMax and Hambright called it, and treated it as, in the Agreement—a non-possessory, non-purchase money, security interest.

Admittedly, there may be a compelling rationale for treating vehicles as pledged goods subject to forfeiture within the meaning of the Alabama Pawnshop Act; however, the undersigned, for her part, cannot articulate one. Forfeiture of collateral to a secured party in a secured credit transaction governed by Alabama Article 9A is the exception, not the rule, and the court finds no

80

conflict in recognizing a debtor's common law and UCC rights and property interest(s) in and to a vehicle in a title loan transaction if only the certificate, not the vehicle, is the pledged good. Stated another way, the court is not persuaded that the Alabama Pawnshop Act's codified, limited exception to the anti-forfeiture provisions of the Alabama UCC and anti-forfeiture rules of the Alabama common law apply to a vehicle in a title loan transaction absent the pawnor's dispossession of the vehicle and the pawnbroker's possession of the vehicle (be it actual or constructive). Since the Vehicle (as distinguished from the Replacement Certificate) is not a pledged good, the Alabama Pawnshop Act's statutory forfeiture provision is inapplicable to the Estate's rights to and property interest in the Vehicle, and the Alabama UCC, Alabama Certificate of Title Act, and (nondisplaced) common law of Alabama govern—meaning (1) legal title to the Vehicle will not indefeasibly vest in TitleMax at law until TitleMax repossesses the Vehicle (at the earliest); (2) the Estate's equitable title and Alabama UCC right of redemption continue until foreclosure; and (3) TitleMax must account to the Estate or Hambright for any surplus realized upon foreclosure. As both repossession and foreclosure remain stayed by Bankruptcy Code section 362(a), the petition date status quo is preserved by the Bankruptcy Code.

No single statute or rule or case will answer every question in every case, and, here, one must view the secured credit transaction through the lens that forfeiture has long been the exception, not the rule. Further, the Bankruptcy Code protects debtors and bankruptcy estates from losses of rights to and interests in collateral in significant ways, even where state law does not.

### iv.  The Unanswered Questions

If the undersigned's conclusion that the Vehicle is not a pledged good subject to forfeiture under the Alabama Pawnshop Act is erroneous—i.e., if a vehicle in a pawnor's possession is

81

subject to characterization as a pledged good under the Act (as some federal bankruptcy and district judges in Alabama have held and as the Eleventh Circuit has accepted, and perhaps even impliedly held, in unpublished opinions)—or if the court concludes, in error, that forfeiture of an unassigned certificate of title, alone, does not effect an absolute title transfer to the vehicle covered by the certificate as a matter of applicable state law, the post-petition forfeiture does not necessarily save TitleMax from treatment as the holder of a secured claim in Hambright's bankruptcy case, nor does the state law forfeiture necessarily give TitleMax inviolable rights to the Vehicle's equity. The Estate's acquisition of Hambright's rights to and property interest in the Vehicle, pre-forfeiture, may render the state law forfeiture provision inapplicable to the Estate's property or otherwise entitle Hambright to treat TitleMax as the holder of a secured claim in her bankruptcy post-forfeiture, as the Eleventh Circuit recently held in an unpublished, panel decision. *See Womack,* 2021 WL 3856036, at *1.

Further, even assuming the Estate's rights to and property interest in the Vehicle were subject to forfeiture, and that forfeiture occurred post-petition, the post-petition forfeiture effected a post-petition transfer of the Estate's rights to and property interest(s) in the Vehicle to TitleMax. This is because, absent repossession, foreclosure, or a voluntary (post-default) transfer, forfeiture is the only mode by which TitleMax could acquire vested legal title and acquire or extinguish the Estate's non-temporal (equitable and statutory) redemption rights (as well as the Estate's UCC surplus right) under Alabama law. The post-petition transfer (if one occurred) might not be void as violative of the stay, since it required no affirmative act by TitleMax. However, the forfeiture might, nevertheless, be avoidable if it is not authorized by the Bankruptcy Code or court order, as Hambright and the Trustee have alleged.

Case 20-70016-JHH    Doc 57    Filed 02/04/22    Entered 02/04/22 16:35:13    Desc Main
Document      Page 82 of 85

In *Northington,* the Eleventh Circuit unequivocally held that the post-petition, pre-confirmation expiration of a chapter 13 debtor's temporal right to redeem a vehicle from a Georgia title lender foreclosed treatment of the lender as the holder of a secured claim in the debtor's plan. However, *Northington* does not answer the question of whether a post-petition forfeiture to a title lender under Alabama law is an *authorized* post-petition transfer, nor does *Northington* answer the question of what (pre-forfeiture) rights and interests a bankruptcy estate acquires from a pawnor in a title loan transaction under Alabama law (as *Womack* evidences). As discussed above, in *Northington*, the Circuit concluded or assumed that title passed to the Georgia pawnbroker pre-bankruptcy (and pre-forfeiture), such that all that the estate acquired on the petition date (and thereafter "lost") was a temporal, statutory right to regain title. In other words, the debtor/pawnor's temporary right to redeem the vehicle under Georgia's pawn statutes entered the estate, but not legal or equitable title to the vehicle. When the statutory right met its natural (albeit temporarily extended) expiration date, the estate was left with only a bare possessory interest under Georgia law. Where a state pawn statute's automatic forfeiture provision divests a bankruptcy estate of an interest in property—i.e., forfeiture does not simply mark the expiration of a statutory grace period for repaying a loan on security of pledged goods; it is the mode by which a bankruptcy estate's rights to and property interest(s) in pledged good(s) are passed to a pawnbroker or extinguished—the forfeiture effects a transfer. This is because *any mode* by which a bankruptcy estate is divested of property or an interest in property is a transfer. The Bankruptcy Code's definition of transfer has no affirmative act requirement. And, as discussed above, the Eleventh Circuit's conclusion in *Northington* that the exceptions to section 541(b)(8)'s exclusion do not indefinitely toll an estate's temporal redemption rights in pledged good(s), should not be understood to mean that the exceptions to the exclusion are of no import in bankruptcy.

Case 20-70016-JHH    Doc 57    Filed 02/04/22    Entered 02/04/22 16:35:13    Desc Main
Document      Page 83 of 85

Here, the question of the alleged transfer's voidability has been placed at issue (AP Doc. 29 at 14-18), but there is no pending request (in this adversary proceeding)[31] to avoid the alleged, post-petition transfer; therefore, the court does not herein decide the issue. However, it is important to note that, if forfeiture of the Vehicle to TitleMax occurred, affirmative acts to give effect to the transfer (like repossession) may remain stayed by operation of Bankruptcy Code section 362(a), because avoidance of the allegedly unauthorized, post-petition transfer is all that is required to return TitleMax and the Estate to the petition date status quo. Repossession, on the other hand, would necessitate an adversary proceeding to recover the Vehicle from TitleMax or its transferee, i.e., repossession may be a taking of property "from the" estate even if it is not a taking of property "of the" estate, as well as an act to collect a pre-petition claim. *See* 11 U.S.C. § 362(a)(3), (6).

Furthermore, even if the alleged forfeiture occurred and is not avoidable, Hambright, on behalf of the Estate, retains a contractual right to possess the Vehicle (post-forfeiture) that continues until TitleMax exercises its state law right to take possession. This means the Estate's possessory interest is not "bare" as a matter of state law. Because the Estate (care of Hambright) retains the contractual right to possess the Vehicle until TitleMax repossesses, the Estate's possessory interest may also be protected by the stay of Bankruptcy Code Section 362(a).

---

[31] Hambright's chapter 13 plan proposes to treat TitleMax as the holder of a secured claim and to vest title to the Vehicle in Hambright upon discharge. (See BK Doc. 41.) If confirmed, the plan might have the effect of avoiding the transfer, since Hambright has possession of the Vehicle and, therefore, an adversary proceeding to recover the property or its value may be unnecessary. *See generally* Fed. R. Bankr. P. 7001(1). Notably, even if avoidance of the post-petition transfer is an adversary proceeding under Fed. R. Bankr. P. 7001(2), confirmation of a chapter 13 plan that effects an avoidance may still bind the parties. *Dudley v. Buffalo Rock Co.*, No. 2:19-cv-00519-RDP, 2021 WL 1164380, at *4 (N.D. Ala. Mar. 26, 2021) (Proctor, J.). Accordingly, the court asked the parties to address the transfer's voidability at a preliminary hearing in this proceeding. However, there is no pending claim for avoidance of the post-petition transfer in this adversary proceeding, and the legality of Hambright's proposed plan is not presently before the court.

## V.    Conclusion

Based on the foregoing, it is ORDERED that the motion for summary judgment filed by Hambright and the Trustee is granted, and the motion for summary judgment filed by TitleMax is denied, and a separate judgment shall enter determining and declaring that the Estate retains property rights and interests in the Vehicle; that TitleMax holds a valid, perfected first priority lien on the Vehicle; and that Hambright is entitled to treat TitleMax as the holder of a claim secured by a lien on the Vehicle in Hambright's bankruptcy case.  As the judgment adjudicates all claims in the Complaint, the judgment shall be designated a final judgment.

DATED this the 4th day of February, 2022.

/s/ JENNIFER H. HENDERSON
UNITED STATES BANKRUPTCY JUDGE